Argued and submitted July 1, 2014, affirmed March 11, petition for review denied June 18, 2015 (357 Or 415)

Paul J. SUNDERMIER,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
acting by and through its
Public Employees Retirement System
and Public Employee Retirement Board,
Trustee and fiduciary,
*Defendant-Respondent,*

*and*

Paul R. CLEARY,
et al.,
*Defendants.*

Marion County Circuit Court
12C13753; A154412

344 P3d 1142

Paul J. Sundermier argued the cause and filed the briefs for appellant *pro se.*

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Garrett, Presiding Judge, and Egan, Judge, and DeVore, Judge.

GARRETT, P. J.

## GARRETT, P. J.

This appeal involves two competing interpretations of a statute. The legislature enacted ORS 238.364, which provides some retired public employees with an additional retirement benefit to offset their state income tax liability. There is no dispute that that was the purpose of the law. Petitioner contends, however, that what the legislature actually enacted is a formula that entitles him to far more—thousands of dollars per month more—than is needed to offset the state income tax on his pension benefit. As explained below, we reject petitioner's interpretation and affirm the judgment of the trial court.

Petitioner retired in 2011 after 30 years of service as a state employee. He obtained a determination of his monthly retirement allowance from the Public Employees Retirement System (PERS). Believing PERS's calculation to be incorrect, petitioner requested an audit. PERS upheld its benefit calculation in a written order. Petitioner sought judicial review pursuant to ORS 238.450(4), alleging several defects in the order. The trial court granted summary judgment to PERS. On appeal, petitioner challenges only one aspect of the trial court's decision: its ruling that PERS correctly calculated the portion of petitioner's retirement benefit attributable to ORS 238.364. Specifically, petitioner argues that PERS, in applying that statute, wrongly increased petitioner's benefit by only four percent instead of 36 percent.

The Supreme Court discussed the history of ORS 238.364 in *Vogl v. Dept. of Rev.*, 327 Or 193, 197-200, 960 P2d 373 (1998). We summarize that history to provide context for our analysis.

For many years, Oregon exempted state pension income from income tax but did not similarly exempt federal retirement benefits. In 1991, the legislature repealed the state pension exemption in light of the United States Supreme Court's decision in *Davis v. Michigan Dept. of Treasury*, 489 US 803, 109 S Ct 1500, 103 L Ed 2d 891 (1989), which had invalidated a similar state/federal pension distinction in Michigan. Oregon public retirees challenged the 1991 law as a breach of contract. The Oregon

Supreme Court held that the 1991 repeal of the tax exemption for state pension benefits was, indeed, a breach of the state's contractual obligation to its public employees. *Hughes v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992).

Following *Hughes*, the 1995 legislature enacted House Bill (HB) 3349, now codified at ORS 238.364, the statute at issue in this case. HB 3349 stated that its purpose was to provide a benefit increase "in compensation for damages suffered by those members and beneficiaries by reason of subjecting benefits * * * to Oregon personal income taxation." Or Laws 1995, ch 569, § 2. In other words, HB 3349 established a mechanism by which the affected public employees would receive an additional benefit to remedy the breach of contract described in *Hughes*. As the Supreme Court later noted in *Vogl*, HB 3349 "expressly state[d], in a variety of ways, that the increased benefits are provided as full and final payment of damages for any claim arising out of the repeal of the previously existing exemption" for state pension benefits. 327 Or at 200.

The relevant parts of ORS 238.364 are as follows:

"(1)(a)   Upon retirement of an employee who is a member of the Public Employees Retirement System and computation of that member's service retirement allowance * * *, the Public Employees Retirement Board shall add to the amount of the allowance, * * * the greater of the percentage increase calculated under ORS 238.366 or a percentage increase calculated under subsection (4) of this section.

"* * * * *

"(4)(a)   The Public Employees Retirement Board shall calculate a multiplier for the purposes of this section equal to the percentage produced by the following formula:

$$\frac{1}{.91^{[1]}}$$

---

[1] Prior to 2009, the denominator in that formula read: 1 / (1 - "the maximum Oregon personal income tax rate"). Oregon Laws 2009, ch 868, § 1. For our purposes, we view that change as immaterial. We do note, however, that the original bill's reference to the "personal income tax rate" is additional evidence that the legislature intended the multiplier to be tied to the top Oregon income tax rate that existed in 1991.

"(b)   Upon the retirement or death of a member of the system, the board shall determine the fraction of the member's retirement allowance or death benefit, including any refund or lump sum payment, that is attributable to service rendered by the member before October 1, 1991. The board shall then calculate a percentage that is equal to that fraction multiplied by the multiplier determined by the board under paragraph (a) of this subsection. The percentage so calculated shall be used to determine the amount of the increase in benefits provided to a member, if any, under this section."

In plainer terms, subsection (4)(b) directs the board to determine what portion of a member's overall retirement benefit is attributable to service prior to October 1, 1991. The reason for that is that October 1, 1991, was the effective date of the tax law change that repealed the exemption; the statute entitled members to the state tax exemption through October 1, 1991, but not after that date. *Vogl*, 327 Or at 200. Accordingly, the period of contract breach, for which members are entitled to the remedy under *Hughes*, ended October 1, 1991. To determine the amount of the member's additional benefit under HB 3349 (that is, the tax remedy), it is necessary to determine what portion of a member's overall service was affected by the breach. That determination is reflected in the ratio of a member's pre-October 1991 years of service to the member's total years of service. That much is undisputed.

The parties focus their arguments on how PERS calculated petitioner's "multiplier" described in subsection (4)(a). The multiplier is the number that, according to subsection (4)(b), must be multiplied by the fraction of a member's overall service that occurred prior to October 1, 1991. The result of that calculation is then used to determine the member's overall benefit increase in dollar terms. PERS used a multiplier of .0989 (or 9.89 percent), and, on appeal, argues that multiplier aligns with the undisputed purpose of ORS 238.364: to provide the remedy required in *Hughes* by reimbursing PERS members for income tax that they paid.

The figure of .0989 (or 9.89 percent) is derived in the following manner: Oregon's highest marginal income

tax rate in 1991 was 9 percent; thus, to be made whole as required by *Hughes*, members must receive a net HB 3349 benefit that offsets the 9 percent tax that they paid. That cannot be achieved, however, simply by multiplying the pre-October 1991 benefit by 9 percent, because the additional benefit under HB 3349 is itself subject to a 9 percent tax. Thus, to achieve a net benefit increase of 9 percent (that is, after imposition of a 9 percent income tax), the benefit increase must be 9.89 percent. This is illustrated by the following example, which, for the sake of simplicity, assumes that a member's benefit amount attributable to pre-October 1991 service is $100:

1. Base benefit amount
   (pre-1991 service):          $100

2. Oregon tax:                  $9 ($100 x 9% rate)

3. Base benefit after tax:      $91

4. HB 3349 benefit:             $9.89 ($100 x 9.89%)

5. Oregon tax on HB 3349
   benefit:                     $.89 ($9.89 x 9% rate)

6. HB 3349 benefit after tax:   $9

As noted, the objective of HB 3349 was to ensure that PERS members would be placed in the position that they would have enjoyed if the 9 percent tax had never been paid. To achieve that, the member in the example above must receive a net HB 3349 benefit of 9 dollars. The use of a 9.89 percent multiplier achieves that result and is, therefore, consistent with the undisputed goal of HB 3349.

In this appeal, petitioner concedes that PERS's use of the 9.89 percent multiplier fully compensates him for the income taxes he paid on his benefit payments attributable to pre-October 1991 service. Petitioner also concedes that that was the outcome that the legislature *hoped* to achieve when it enacted HB 3349. He argues, however, that the formula for calculating the multiplier that the legislature actually put into law requires a different result. Petitioner interprets HB 3349 to require PERS to use a multiplier of 109.89 percent. That is so, according to petitioner, because subsection (4)(a) of the statute directs PERS to "calculate a multiplier

for the purposes of this section equal to the percentage produced by the following formula." The formula is 1 divided by .91. That computation produces the number 1.0989. When converted to a percentage, 1.0989 becomes 109.89 percent.

Petitioner's argument then goes further. He argues that, once PERS employs the proper multiplier, he is entitled to a large benefit increase. To explain petitioner's point, we return to the same example:

1. Base benefit amount (pre-1991 service):     $100

2. Oregon tax:     $9 ($100 x 9% rate)

3. Base benefit after tax:     $91

4. HB 3349 benefit (petitioner's version):     $109.89 ($100 x 1.0989)

5. Oregon tax on HB 3349 benefit:     $9.89 ($109.89 x 9% rate)

6. HB 3349 benefit after tax: $100

In petitioner's view, the $100 from line 6 is the "amount of the increase in benefits" under HB 3349. That number must be *added* to the amount in line 3. That would give petitioner a total benefit of $191, and a windfall of $91.

Petitioner makes no pretense that the legislature intended such generosity. He acknowledges that the legislature surely intended that the formula in HB 3349 would achieve the result of providing the tax remedy required by *Hughes,* no more. But, petitioner argues, the legislature actually enacted a different formula than it intended, and that is the formula that PERS must apply.

PERS makes two arguments in response. The first is that petitioner's reading of the statute has already been foreclosed by the Supreme Court's decision in *Vogl.* The second is that, even if *Vogl* does not control, petitioner's interpretation is simply wrong.

We first consider whether *Vogl* is controlling. *Vogl* is, of course, binding on us as the decision of a superior court. *See State v. Westlund,* 75 Or App 43, 49 n 5, 705 P2d 208

(1985), *aff'd in part, rev'd in part*, 302 Or 225, 729 P2d 541 (1986) (stating that even if a Supreme Court decision "were both an innovation in Oregon law and completely indefensible analytically, we would be bound to follow it * * * because the decision is a binding precedent of a superior court").

In *Vogl*, plaintiffs in two consolidated cases argued that HB 3349 violated the "'equal tax treatment' requirement that is inherent in the federal doctrine of intergovernmental tax immunity." 327 Or at 197. The Supreme Court engaged in a thorough discussion of the history of Oregon's "long-running struggle concerning the requirements of the intergovernmental tax immunity doctrine," culminating in the adoption of HB 3349 in 1995. 327 Or at 197-200. For our purposes, the important question answered in *Vogl* is whether HB 3349 provided for "compensation" or whether it provided a disguised and "unlawful 'tax rebate.'" 327 Or at 199. In answering that question, the Supreme Court contrasted the payment scheme in HB 3349 with a 1991 statute, which had been held *not* to violate the principle of intergovernmental tax immunity. The court explained:

> "First, unlike the flat percentages employed in the 1991 statute, the 1995 statute increases benefits by way of a formula that is fairly closely matched to the task of replacing PERS income that will be lost to taxes. In theory, that formula will leave PERS recipients with an after-tax amount that roughly approximates what they would have received, had their pension (or that portion of it that vested before 1991) been tax exempt. * * * Although, in any individual case, the formula can only approximate the amount needed to offset the effect of 1991 repeal, the formula is as close as the state can get to replicating the effect of the repealed tax exemption without delving into individual tax circumstances.
>
> "On the other hand, as with the 1991 increase, entitlement to the 1995 increase is not conditioned on actual liability for an equivalent amount in state taxes. PERS recipients receive the increase even if they pay little or no state income tax on their PERS benefits. Again, although the increase generally replicates the effect of a tax rebate, it may or may not have that effect in individual cases.
>
> "The upshot of the foregoing discussion is that, although the 1995 statute is similar to its 1991 predecessor in that it

does not purport to offset, dollar for dollar, the amount lost to the exemption repeal in every individual case, its design and effect far more closely match such a purpose. Clearly, as the state moves closer to replacing the lost net income on a dollar-for-dollar basis, the fact that the increase is in fact a tax rebate, rather than a general increase in compensation to 'make up' for lost net income, becomes more apparent. That is particularly so in view of the fact that the increase is available only in those years when PERS benefits are not tax exempt. Although that fact, by itself, does not transform the increase into a tax rebate, *Ragsdale* [*v. Dept. of Rev.*, 321 Or 216, 231, 895 P2d 1348 (1995)], it is a relevant consideration where, as here, other suggestive factors are present."

*Vogl*, 327 Or at 206-07 (emphases omitted).

As that language clearly demonstrates, the Supreme Court has construed ORS 238.364 as providing a remedy meant to approximate a rebate of income tax paid. Petitioner's construction of ORS 238.364, in contrast, would provide a windfall far in excess of what he would have received, had his "pension (or that portion of it that vested before 1991) been tax-exempt." *Vogl*, 327 Or at 206. Petitioner's interpretation is plainly inconsistent with how the Supreme Court interpreted ORS 238.364 in *Vogl*.

Petitioner, however, argues that the Supreme Court in *Vogl* did not address, and probably had no reason to consider, any other possible interpretations of the statute, including the different interpretation that petitioner advances. It is difficult to know from reading *Vogl* whether the Supreme Court considered, and rejected, any other construction of the statute. None appears to have been urged. The Supreme Court has said that its prior construction of a statute is "authoritative" when its construction was "necessary" to the holding. *See, e.g.*, *Mastriano v. Board of Parole*, 342 Or 684, 692, 159 P3d 1151 (2007). When, however, the court mentions an interpretation of a statute by way of *dictum*, that interpretation is not binding. *Halperin v. Pitts*, 352 Or 482, 492, 287 P3d 1069 (2012). *Dictum* is a statement that was not "necessary" to the holding. *Engweiler v. Persson/Dept. of Corrections*, 354 Or 549, 558, 316 P3d 264 (2013). Whether a particular statement was "necessary" to

the court's holding can be an elusive question. *Id*. Although the court in *Vogl* did not discuss competing constructions of ORS 238.364, it is clear that the analysis of that statute's *purpose* was central to the court's holding. Accordingly, it would be difficult to regard the court's interpretation of ORS 238.364 as mere *dictum* that is not binding on this court.

Nevertheless, to the extent that there is any doubt as to whether this case is controlled by *Vogl*, we proceed to consider petitioner's interpretation of ORS 238.364 on its merits. Our approach is guided by two main considerations. First, we apply the familiar framework for statutory interpretation established in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and subsequently modified by *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). Under that framework, the goal of statutory interpretation is to discern the intent of the legislature that enacted the statute. *Gaines*, 346 Or at 171. The most persuasive evidence for determining the legislature's intent is the "text and context" of the statute itself. *Id*. A statutory term's "context" includes both its immediate context—the "phrase or sentence in which the term appears"—and the "broader context," which includes other statutes "on the same subject." *State v. Stamper*, 197 Or App 413, 417-18, 106 P3d 172, *rev den*, 339 Or 230 (2005). Statements of statutory policy are also considered useful context for interpreting a statute. *Providence Health System v. Walker*, 252 Or App 489, 500, 289 P3d 256 (2012), *rev den*, 353 Or 867 (2013). Such statements, however, "should not provide an excuse for delineating specific policies not articulated in the statutes[.]" *Warburton v. Harney County*, 174 Or App 322, 329, 25 P3d 978, *rev den*, 332 Or 559 (2001). After consulting a statute's text and context, we consider any "pertinent legislative history." *Gaines*, 346 Or at 177. Finally, and only if the legislature's intent remains unclear, we will "resort to general maxims of statutory construction." *Id*. at 172.

The second consideration is that, when interpreting a statute, we are "simply to ascertain and declare what is, in terms or in substance[.]" *See* ORS 174.010. That is, when a statute clearly and unambiguously says one thing, we cannot simply conclude that the legislature meant something

entirely different. *See Gordon v. Hall*, 232 Or App 174, 186 n 9, 221 P3d 763 (2009) ("[T]he legislature cannot say 'black' and mean 'white.'").

Petitioner's theory is that, notwithstanding the undisputed purpose, legislative history,[2] and other evidence that the legislature intended precisely the result that PERS has achieved by using a multiplier of 9.89 percent, ORS 238.364(4)(a) clearly and unambiguously requires a different result. That is, the legislature may have meant "white," but it said "black."

We disagree. Petitioner is correct that the statute directs PERS to use a multiplier of 109.89 percent (or 1.0989). But petitioner misunderstands *how* the statute directs PERS to use that multiplier.

Implicit in petitioner's argument is the contention that the amount generated by using the 109.89 percent multiplier is what PERS is required to award him as the "increase in the amount of benefits" for purposes of the statute. What the statute actually provides is that "[t]he percentage so calculated *shall be used to determine the amount of the increase in benefits* provided to a member, if any, under this section." ORS 238.364(4)(b) (emphasis added).

In other words, the real issue posed by this case is not, as petitioner argues, "how the math works," but how PERS is to apply the results of the mathematical equation set forth in the statute. Given that the legislature's undisputed goal in enacting ORS 238.364 was to place PERS members in the position they would have been in if the 9 percent tax had never been paid, the answer is apparent. To explain, we return one final time to the example from above, in which we assume that $100.00 of a member's benefits are attributable

---

[2] An extended discussion of the legislative history is unnecessary because, again, petitioner makes no argument that the legislature intended the result that he desires. Nonetheless, two pieces of legislative history that make the legislature's intent perfectly clear are the floor statement by the carrier of HB 3349, *see* Tape Recording, House Floor Debate, HB 3349, Jun 5, 1995, Tape 225, Side A (statement of Rep Schoon) (referring to the "9.89% benefit increase"), and the summary prepared by the Legislative Fiscal Office, *see* Fiscal Analysis of Proposed Legislation, Legislative Fiscal Office, HB 3349, Jun 15, 1999 ("All retired members and beneficiaries as of the effective date of the bill would receive a 9.89% benefit increase.").

to service rendered prior to October 1, 1991. Under that scenario, the calculation required by HB 3349 is $100 x 109.89 percent, which equals $109.89. That is the amount that the member must receive, *in total*, in order to be held harmless from state income tax. What petitioner's argument overlooks is that, of that amount, $100.00 was *already paid* to the member. Contrary to petitioner's theory, the statute does not direct PERS to add the HB 3349 amount to the original benefit. Rather, to "determine the amount of the increase in benefits" to pay the member, PERS must subtract from the HB 3349 amount ($109.89) the base benefit that was already paid ($100.00), yielding a benefit increase of $9.89. With that understanding, petitioner's complaint that PERS used a multiplier of 9.89 percent instead of 109.89 percent simply misses the point. Multiplying the base benefit ($100.00) by 109.89 percent and then subtracting the amount that was already paid ($100.00) produces $9.89. That is precisely the same outcome that PERS achieves by multiplying the base benefit by a multiplier of 9.89 percent. Either method yields the "amount of the increase in benefits" necessary to fulfill the legislature's intent.

In short, we conclude that PERS correctly generated a "multiplier" in accordance with the provisions of HB 3349 and correctly used that multiplier to further the undisputed purpose of the dispute. Accordingly, the trial court did not err in granting summary judgment to PERS.

Affirmed.