EGAN, C. J.
*390 Defendant appeals a judgment of conviction for interfering with a peace officer, ORS 162.247, arising out of his failure to obey a police officer's order to leave a public meeting of the Astoria City Council after he spoke out of turn and refused to obey the mayor's request that he leave. Defendant contends that the trial court erred in denying his motion for judgment of acquittal. Additionally, defendant argues that the imposition of certain conditions of probation and a $100 fee were inappropriate. We affirm the trial court's denial of defendant's motion for a judgment of acquittal; decline to address the special conditions of probation as we have concluded that that issue is moot; and decline to exercise our discretion to reverse the imposition of the $100 fee. Accordingly, we affirm.
In reviewing the trial court's denial of defendant's motion for judgment of acquittal, we view the facts in the light most favorable to the state and draw all reasonable inferences in the state's favor. State v. Lupoli , 348 Or. 346, 366, 234 P.3d 117 (2010).
The mayor of Astoria began a city council meeting with discussion about a communication tower. The mayor allowed public comment on the tower both during and at the end of the discussion. After closing the discussion, the mayor asked if anyone objected to the council's jurisdiction to hear the next item on the agenda. At that point, defendant came up to the podium and began to speak about the communication tower. The mayor explained that defendant had missed his opportunity to address that issue, but defendant continued to talk and told the mayor, "You're under citizen's arrest." The mayor asked defendant to leave council chambers, but defendant refused and began to give the mayor Miranda warnings.
Police Chief Bradley Johnston, who was attending the council meeting, asked the mayor if she wanted defendant removed. The mayor said yes, so Johnston approached the podium and showed his badge to defendant. Defendant greeted the chief by saying, "Hello, Chief Johnston. You're under arrest as well." Johnston asked and then ordered defendant to leave, but defendant refused. Johnston touched *391 defendant's arm, and defendant pulled away, turned, and made movements suggesting he was going to swing at Johnston. Johnston forced defendant to the ground. Defendant tried to get up and *307 push Johnston away, while "ranting" about conspiracies and asking the attendees for help. When other officers arrived, defendant cooperated and was escorted out of the meeting.
The state charged defendant with interference with a peace officer, as well as second-degree disorderly conduct and second-degree trespass. The case proceeded to a jury trial, where defendant represented himself with the assistance of a court-appointed legal advisor. At the close of evidence, defendant moved for a judgment of acquittal on the count of interfering with a peace officer on the grounds that the order that defendant refused to obey was not lawful. The court denied the motion, stating:
"[I]t appears to be undisputed evidence that the mayor, who we've established has taken an oath of office, has the directive to run the city council meetings and has the authority to preside over them and remove people, and made a decision to remove someone, you, and requested law enforcement assistance for that removal. * * * And I guess it was the question of whether or not that's a lawful order, and that's something that the jury can decide, because I think there are facts sufficient to allow that question to be put to the jury."
The jury found defendant guilty of interfering with a peace officer, but acquitted him of the other charges.
On the same day that the jury rendered its verdict, the trial court sentenced defendant. The state proposed that the court include a mental health evaluation as part of probation and asked the court to assess "the standard court costs for misdemeanor conviction and probation." The trial court placed defendant on 18 months of bench probation subject to several conditions, including submitting to a mental health evaluation and signing a release so the court could access information from that evaluation. The court asked defendant about his ability to pay attorney fees, and defendant stated that he did not have a regular source of income, but that he did some "odd jobs" and received "one form of government assistance, the food." The court waived attorney *392 fees, but imposed a $100 probation fee and a $100 misdemeanor fine, because the court thought it was "required to." The court informed defendant that he could set up a payment plan of as little as $5 a month.
On appeal, defendant assigns error to the trial court's (1) denial of his MJOA, (2) imposition of a condition of probation requiring him to pay the costs of his mental health evaluation and treatment, (3) imposition of a condition of probation requiring him to sign releases of information pertaining to his mental health treatment, and (4) imposition of the misdemeanor fine. With regard to the second and third assignments, as noted above, we have concluded that the issues are moot. Thus, we examine only the first and fourth assignments.
Regarding the first assignment of error, defendant contends that the trial court should have acquitted him of interfering with a peace officer, because the police chief's order was not "lawful." We review "to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt." State v. Hall , 327 Or. 568, 570, 966 P.2d 208 (1998).
The essential elements of interfering with a peace officer, as stated in ORS 162.247(1), are that "the person, knowing that another person is a peace officer * * * [r]efuses to obey a lawful order by the peace officer[.]" A "lawful order" is one authorized by, and not contrary to, substantive law. State v. Ausmus , 336 Or. 493, 504, 85 P.3d 864 (2003). When a defendant raises the lawfulness of an order as a defense, the state still has the burden of proving the element and disproving the defense beyond a reasonable doubt. State v. White , 211 Or. App. 210, 216, 154 P.3d 124 (2007), adh'd to on recons. , 213 Or. App. 584, 162 P.3d 336 (2007), rev. den. , 343 Or. 224, 168 P.3d 1155 (2007).
Defendant argues that Johnston's order was not lawful because Oregon's Public Meetings Law, as defendant understands it, does not allow the exclusion of anyone from a public meeting unless a statutory exception *308 applies.[1] As *393 there is no explicit statutory exception for excluding individuals who speak out of turn, defendant concludes that the mayor, and therefore also Johnston, lacked legal authority to order him out of the city council meeting. The state responds that the mayor had authority to maintain order at city council meetings pursuant to the city charter and, further, that the provisions in the Public Meetings Law do not displace a local government's authority to regulate the conduct of its governing body's open meetings.
When determining whether an order is "lawful," or in compliance with "the substantive laws of the state," we look at whether the order at issue was lawful on its face. State v. Navickas , 271 Or. App. 447, 451, 351 P.3d 801 (2015), rev. den. , 358 Or. 248, 364 P.3d 1001 (2015). Here, the order was made pursuant to the mayor's authority under the Astoria City Charter to "preserve order" when the mayor is present at city council meetings. Astoria City Charter of 1997, Section 4.4(1)(b). Nevertheless, defendant contends that the mayor's order was unlawful on its face, because Oregon's Public Meetings Law, which does not have an explicit provision giving authority to "preserve order," prevails over the mayor's authority under the charter.
Oregon's Public Meetings Law, ORS 192.610 to 192.690, provides that "[a]ll meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by [the Public Meetings Law]." ORS 192.630(1) (emphasis added). Defendant contends that the italicized portion gives each and every person a right to be present at any meeting subject to the law unless an exception is spelled out in the law itself. Defendant bases his conclusion on the dictionary definitions of "all," "permit," and "attend." However, in construing a statute, we do more than simply consult dictionaries and interpret words in a vacuum. State v. Cloutier , 351 Or. 68, 96, 261 P.3d 1234 (2011). We must *394 also consider the context in which the legislature used the words and other indicators of the legislature's intent. Elk Creek Management Co. v. Gilbert , 353 Or. 565, 574, 303 P.3d 929 (2013).
The legislature enacted the Public Meetings Law in 1973 as part of an effort to help build public confidence in government. Tape Recording, Joint Special Committee on Professional Responsibility, SB 15, Feb. 26, 1973, Tape 2, Side 2 (statement of Sen. Fred Heard). The bill was intended to be a clear-cut statement of public policy condemning the practice of governmental bodies holding "secret meetings." Id. Legislators reasoned that, because taxpayer money goes directly to governmental bodies, the public has a right to know what goes on at their meetings. Id. (statement of Rep. Robert Ingalls).
In the effort to increase transparency in government, Senate Bill (SB) 15 and House Bill (HB) 2157 were considered in the Joint Special Committee on Professional Responsibility. Id. (statement of Sen. Fred Heard). SB 15 would make only meetings open to the public, while HB 2157 would make both meetings and governmental records open to the public. Id. (statement of Attorney General Lee Johnson). The two bills differed in several ways; as relevant here, HB 2157 contained an explicit provision that "anyone may be removed if it is necessary to do so in order to maintain order," whereas SB 15 was silent on the matter. Appendix C, Joint Special Committee on Professional Responsibility, SB 15 and HB 2157, Feb. 26, 1973 (accompanying testimony of Superintendent of Banks for Oregon John B. Olin). The committee members eventually used HB 2157 as the basis for the public records law and SB 15 for the public meetings law. Tape Recording, Joint Special Committee on Professional Responsibility, SB 15, Feb. 26, 1973, Tape 2, *309 Side 1 (statement of Sen. Edward Fadeley); House Committee Report, Joint Special Committee on Professional Responsibility, HB 2157, May 17, 1973. The members did not add a "maintain order" provision to SB 15, nor did they discuss their decision not to. See Minutes, Joint Special Committee on Professional Responsibility House Members, May 14, 1973, page 3. However, Senator Heard stated that his intention was to enact a "skeleton" for a strong, comprehensive, and realistic *395 open meetings law with which governmental bodies would be able to comply. Tape Recording, Joint Special Committee on Professional Responsibility, SB 15, Feb. 26, 1973, Tape 2, Side 2 (statement of Sen. Fred Heard). Furthermore, the final version of the bill included the policy provision, "It is the intent of [the Public Meetings Law] that decisions of governing bodies be arrived at openly." ORS 192.620. This statement of statutory policy also informs our understanding of the legislature's intent. Sundermeir v. PERS , 269 Or. App. 586, 595, 344 P.3d 1142 (2015), rev. den. , 357 Or. 415, 356 P.3d 638 (2015).
After reviewing the text in context and pertinent legislative history, see State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009), and despite the absence of an explicit provision in the Public Meetings Law for "maintaining order," we disagree with defendant's construction of the statute. When the legislature provided that "all persons be permitted to attend any meeting," it prevented governmental bodies from closing off their decision-making process to the public. It did not prevent governmental bodies from maintaining order at their own meetings.
We note that we have recognized that a legislative body may constitutionally limit public participation in its meetings "to times, places and methods for the enlightenment of the community which, in view of existing social and economic conditions, are not at odds with the preservation of peace and good order." Gigler v. City of Klamath Falls , 21 Or. App. 753, 761, 537 P.2d 121 (1975) (quoting Jones v. Opelika , 316 U.S. 584, 594, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942), rev'd on other grounds, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943) ). Specifically, we have upheld the constitutionality of a mayor's orders "given in his effort to preside over an orderly meeting while not giving way to willful obstruction." Id. at 760, 537 P.2d 121.
In this case, the mayor had authority under the city charter to preserve order at the city council meeting, and in requesting that Johnston remove defendant, she exercised that authority. Thus, Johnson's order requesting defendant to leave was lawful on its face. As defendant has not asserted any other argument, the trial court did not err in denying defendant's motion for a judgment of acquittal.
*396 Defendant argues that the trial court erred in imposing the $100 misdemeanor fine because the trial court misunderstood its authority under ORS 137.286. Defendant concedes that he did not preserve the issue of the $100 fine, but he asserts that the error is plain and requests review under ORAP 5.45(1). The state concedes, and we agree, that the trial court did plainly err in understanding its authority to decide whether to impose the fine. The trial court stated that it was "required to" impose a fine, when ORS 137.286 clearly provides the trial court with discretion to waive a minimum fine.[2] Nevertheless, the state argues that we should not exercise our discretion to correct the error because the error was not grave and there is evidence in the record indicating the trial court did consider defendant's ability to pay.
In determining whether to exercise our discretion to correct a plain error, we examine a variety of factors, including "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been *310 served in the case in another way[.]" Ailes v. Portland Meadows, Inc. , 312 Or. 376, 382 n. 6, 823 P.2d 956 (1991). Here, the error is not grave, because, though the trial court misunderstood its authority to waive the minimum fee, it did consider defendant's financial situation in imposing the fee. See State v. Wheeler , 268 Or. App. 729, 732, 344 P.3d 57 (2015) (The statute giving courts the authority to impose a fine "requires only that the court consider the defendant's financial resources in deciding whether to include a fine (and its amount) in the defendant's sentence" (emphasis in original) ). Further, the trial court suggested setting up a payment plan of just $5 a month. Given that the trial court knew defendant did "odd *397 jobs" and only imposed the minimal $100 fee, we decline to exercise our discretion to correct the error.
Affirmed.

Defendant does not challenge the constitutionality of the mayor's decision to order him to leave the public meeting, so we do not address issues under the First Amendment to the United States Constitution or Article I, section 8 of the Oregon Constitution. However, we note that the Ninth Circuit has held that in a city council meeting, the council may exclude individuals only when they cause an actual disruption, not a "constructive disruption, technical disruption, virtual disruption, nunc pro tunc disruption, or imaginary disruption." Cf. Norse v. City of Santa Cruz , 629 F.3d 966, 976 (9th Cir. 2010), cert. den. , 565 U.S. 823, 132 S.Ct. 112, 181 L.Ed.2d 37 (2011).

ORS 137.286 governs minimum fines for misdemeanors and felonies and provides, as relevant here,
"(3) A court may waive payment of the minimum fine established by this section, in whole or in part, if the court finds that requiring payment of the minimum fine would be inconsistent with justice in the case."
(Emphasis added.)