No. 22         January 22, 2026         545

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

NEWSUN ENERGY LLC,
a Delaware limited liability company,
*Petitioner,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON,
an agency of the State of Oregon,
*Respondent,*

*and*

IDAHO POWER COMPANY,
PacifiCorp dba Pacific Power,
and Portland General Electric Company,
*Intervenor-Respondents.*
Public Utility Commission of Oregon
A181991

Argued and submitted January 6, 2025.

Jonathan Harlan argued the cause for petitioner. On the briefs were Casey M. Nokes, Richard G. Lorenz, Tyler R. Whitney and Cable Huston LLP.

Jordan Silk, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Jordan R. Schoonover argued the cause for intervenor-respondents Idaho Power Company, Pacific Power and Portland General Electric Company. Also on the brief was Adam Lowney, Lynne Dzubow and McDowell Rackner Gibson PC.

Before Ortega, Presiding Judge, Hellman, Judge, and O'Connor, Judge.*

HELLMAN, J.

Rules held valid.

_____
\* O'Connor, Judge *vice* Mooney, Senior Judge.

**HELLMAN, J.**

In this proceeding under ORS 183.400, petitioner NewSun Energy, LLC challenges rules amended and promulgated by the Public Utility Commission of Oregon (PUC) in 2023, which are part of OAR chapter 860, division 029. Specifically, PUC's 2023 rulemaking amended or added the following rules: OAR 860-029-0005, 860-029-0010, 860-029-0044, 860-029-0045, 860-029-0046, 860-029-0047, 860-029-0120, 860-029-0121, 860-029-0123, and 860-029-0124 (collectively, the 2023 rules). NewSun asserts that the 2023 rules are invalid in their entirety because PUC failed to provide the notice required by ORS 183.335. NewSun also asserts that PUC exceeded its authority in adopting two specific rules—OAR 860-029-0120(2) and OAR 860-029-0121(5)—because those rules conflict with ORS 758.525 and do not conform to legislative policy expressed in ORS 758.515. PUC, along with intervenors Idaho Power Company, PacifiCorp, and Portland General Electric Company, defend the validity of the rules.

We conclude that PUC substantially complied with the notice requirement in ORS 183.335, and that PUC did not exceed its statutory authority in adopting OAR 860-029-0120(2) and OAR 860-029-0121(5), as argued by NewSun. Therefore, we hold the 2023 rules valid.

I.   LEGAL AND PROCEDURAL BACKGROUND

At the outset, we provide a brief description of the legal backdrop for this rule challenge, which is grounded in federal law. The federal Public Utility Regulatory Policies Act of 1978 (PURPA), 16 USC section 824a-3, requires the Federal Energy Regulatory Commission (FERC) to prescribe rules "to encourage cogeneration and small power production," and "which rules require electric utilities to offer to (1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and (2) purchase electric energy from such facilities." 16 USC § 824a-3(a). Qualifying cogeneration facilities and qualifying small power production facilities are called "qualifying facilities" or QFs and are defined by rule. *See* 18 CFR § 292.101(b)(1) (defining qualifying facility); *see also* OAR 860-029-0010(50)

(defining qualifying facility). PURPA also directs state agencies, like PUC, to implement the FERC rules with respect to electric utilities for which it has ratemaking authority. 16 USC § 824a-3(f)(1). Oregon implements PURPA and its enacting rules through ORS 758.505 to 758.555, and through PUC's implementing rules in OAR chapter 860, division 029, which apply to the "interconnection, purchase, and sale arrangements between a public utility and facilities that are qualifying facilities." OAR 860-029-0005(1); *see also* OAR 860-029-0001.

Under those rules, PUC requires public utilities to "offer standard non-renewable avoided cost rates to eligible qualifying facilities," OAR 860-029-0043, and "offer standard power purchase agreements to eligible qualifying facilities," OAR 860-029-0120(1). Eligibility for a standard avoided cost rate and purchase agreement (standard contract) is provided by rule, OAR 869-020-0045, and many of the rules in OAR chapter 860, division 029, including the 2023 rules, govern those standard contracts, including by supplying standard terms and conditions. For qualifying facilities that are not eligible for a standard contract, public utilities are required to offer "nonstandard avoided cost rates and nonstandard power purchase agreements" (nonstandard contracts), as provided in OAR 860-029-0130, a rule that was not amended in 2023.

The rulemaking at issue here began in July 2019, when PUC opened Docket No. AR 631 for a rulemaking to address "Procedures, Terms, and Conditions Associated with Qualifying Facilities (QF) Standard Contracts." In 2021, PUC staff informally proposed rule changes to obtain input from stakeholders, and obtained that input through workshops, public meetings, and receipt of comments. PUC filed the official notice of proposed rulemaking on November 23, 2022, and following comment and a public hearing, PUC adopted the proposed rules by order (except one), and also adopted a subsequent order containing corrections to the adopted rules. In July 2023, PUC filed the final adopted rules with the Secretary of State, and NewSun brought this judicial review challenging the validity of those rules.

## II.   ANALYSIS

Under ORS 183.400(4), we may declare a rule invalid only if the rule "[v]iolates constitutional provisions," "[e]xceeds the statutory authority of the agency," or "[w]as adopted without compliance with applicable rulemaking procedures." NewSun challenges the 2023 rules on two of those bases: (1) The 2023 rules are invalid because PUC failed to comply with the notice requirement in ORS 183.335, and (2) PUC exceeded its statutory authority in adopting OAR 860-029-0120(2) and OAR 860-029-0121(5). In addressing NewSun's challenges, we are limited to examining "[t]he rule under review," "[t]he statutory provisions authorizing the rule," and "[c]opies of all documents necessary to demonstrate compliance with applicable rulemaking procedures." ORS 183.400(3).

### A.   *Challenge to the Adequacy of the Rulemaking Notice*

We first address NewSun's challenge to PUC's rulemaking notice under ORS 183.335. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984) (stating that procedural challenges should be addressed before challenges to the agency's scope of authority for the rule). "When a party challenges a rule on the ground of failure to comply with ORS 183.335 notice procedures, we review for whether the rule was adopted in 'substantial compliance' with the notice provisions of ORS 183.335." *Columbia Riverkeeper v. ODFW*, 345 Or App 213, 220, ___ P3d ___ (2025) (citing ORS 183.335(11)). To "substantially comply" with the notice requirements in ORS 183.335, "the rule revisions must fall within the general subject matter described in the notice, and the notice must fulfill the essential matters necessary to assure every reasonable objective of the statute, which will depend on the facts of each case."[1]

---

[1] With regard to notice, the "reasonable objectives" or purposes of ORS 183.335 include:

"(1) to inform the interested public about intended agency action that might affect them, (2) to trigger an agency's opportunity to receive the benefit of public feedback on the proposed action, and, regarding the statement of need, (3) to ensure that interested persons can meaningfully participate in the public comment period by submitting data and arguments that are responsive to the agency's concerns in proposing the rule or rule change."

*Columbia Riverkeeper*, 345 Or App at 225-26 (internal quotation marks, citations, and brackets omitted).

*Id.* at 221 (internal quotation marks omitted). "We evaluate the 'context of the notice as a whole' to determine whether the purposes of ORS 183.335 have been served." *Id.* at 220 (quoting *Fremont Lumber Co. v. Energy Facility Siting Council*, 325 Or 256, 262-63, 936 P2d 968 (1997)).

In challenging PUC's notice, NewSun makes a narrow argument in its opening brief. PUC's caption for its notice reads, "Rulemaking Addressing Procedures, Terms, and Conditions Associated with Qualifying Facility Standard Contracts." NewSun asserts, however, that the rule amendments also affect nonstandard contracts because rules of general applicability, and a rule regarding standard rates, were also amended. Because many qualifying facilities are not eligible for standard contracts, NewSun asserts that those qualifying facilities did not receive adequate notice such that the purposes of the notice were fulfilled.

We reject NewSun's argument because it does not provide a basis for us to invalidate any of the challenged rules. Under ORS 183.335(2)(a)(A), an agency's notice must include "[a] caption of not more than 15 words that reasonably identifies the subject matter of the agency's intended action." However, under ORS 183.335(11)(c), "[a] rule is not subject to judicial review or other challenge by reason of failing to comply with subsection (2)(a)(A) of this section." In the opening brief, NewSun does not point to any deficiency in PUC's notice other than the caption, which cannot provide a basis for judicial review.

In its reply brief and at oral argument, NewSun recast its notice argument more broadly, citing ORS 183.335(2)(a)(B), and arguing that nothing in the notice fulfilled the purpose of notifying parties interested in nonstandard contracts that the rules could affect those contracts. As noted above, when we determine whether an agency has substantially complied with the notice requirement in ORS 183.335, we look at the "context of the notice as a whole." *Fremont Lumber Co.,* 325 Or at 262. Here, PUC's notice included the proposed amendments, including the amendments that NewSun asserts affected nonstandard contracts. The amendments potentially affecting nonstandard contracts were obvious because they were the first three rules

listed on the front page of the notice and included in the proposed changes: OAR 860-029-005, 860-029-0010, and 860-029-0043. The proposed amendments to those rules were obvious and easy to understand their scope, in that for two of the rules the rule is short and the amendments were not complex, and for the third rule it addresses definitions of general applicability. Further, OAR 860-029-045, a new rule, included a short summary that clearly stated that it pertained to eligibility for both standard avoided costs and standard power purchase agreements. Despite recasting their argument in the reply brief as relying on a failure to comply with ORS 183.335(2)(a)(B) and not (2)(a)(A), NewSun has not explained in what manner PUC's notice was inadequate in the context of *the whole* of PUC's notice.

We also are not persuaded by NewSun's argument that the notice contained no summary of the subject matter of the rulemaking as required by ORS 183.335(2)(a)(B). Again, we must look at the whole notice and the notice did contain a brief summary of the rulemaking in the section labeled "Need for the Rule(s)," and, immediately preceding all but one of the individual proposed rules, PUC provided a short subject matter summary of each proposed amendment or new rule.

Based on the context of PUC's notice as a whole, we conclude that PUC substantially complied with ORS 183.335, because interested parties, even those only interested in nonstandard contracts, would have been informed that PUC's action might affect them such that they could meaningfully participate in the public comment period.

We thus reject NewSun's first assignment of error.

B.  *Challenge to PUC's Statutory Authority*

We turn to NewSun's second assignment of error which challenges PUC's statutory authority to adopt OAR 860-029-0120(2) and OAR 860-029-0121(5). In addressing a challenge to statutory authority, "[t]he record on review *** consists of two things only: the wording of the rule itself (read in context) and the statutory provisions authorizing the rule." *Wolf v. Oregon Lottery Commission*, 344 Or 345, 355, 182 P3d 180 (2008) (citing ORS 183.400(3)). An agency

"[e]xceeds the statutory authority of the agency," ORS 183.400(4)(b), if the rule "depart[s] from a legal standard expressed or implied in the particular law being administered, or contravene[s] some other applicable statute." *Planned Parenthood Assn.*, 297 Or at 565.

On review, NewSun challenges OAR 860-029-0120(2) and OAR 860-029-0121(5) on the basis that they contravene ORS 758.525 and do not conform to legislative policy expressed in ORS 758.515. We first set the policy backdrop against which NewSun makes its arguments, and then address the arguments specific to the two rules challenged.

1. *Policy backdrop*

As set out above, PURPA requires FERC to prescribe rules "to encourage cogeneration and small power production" and "which rules require electric utilities to offer to (1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and (2) purchase electric energy from such facilities." 16 USC § 824a-3(a). The Oregon legislature has set out goals and polices that go further than PURPA's statement:

"The Legislative Assembly finds and declares that:

"(1) The State of Oregon has abundant renewable resources.

"(2) It is the goal of Oregon to:

"(a) Promote the development of a diverse array of permanently sustainable energy resources using the public and private sectors to the highest degree possible; and

"(b) Insure that rates for purchases by an electric utility from, and rates for sales to, a qualifying facility shall over the term of a contract be just and reasonable to the electric consumers of the electric utility, the qualifying facility and in the public interest.

"(3) It is, therefore, the policy of the State of Oregon to:

"(a) Increase the marketability of electric energy produced by qualifying facilities located throughout the state for the benefit of Oregon's citizens; and

"(b) Create a settled and uniform institutional climate for the qualifying facilities in Oregon."

ORS 758.515.

The legislature also conferred broad policy-making authority to PUC to implement ORS 758.505 to 758.555, providing, as relevant here:

"(2) The terms and conditions for the purchase of energy or energy and capacity from a qualifying facility shall:

"(a) Be established by rule by the commission if the purchase is by a public utility;

"* * * * *

"(3) The rules or policies adopted under subsection (2) of this section also shall:

"(a) Establish safety and operating requirements necessary to adequately protect all systems, facilities and equipment of the electric utility and qualifying facility;

"(b) Be consistent with applicable standards required by [PURPA]."

ORS 758.535.

Under that broad authority, PUC can adopt rules within that subject matter as long as the rules are consistent with the general legislative policy; that is, the rule must be within the range of discretion allowed by the more general statutory policy. *Planned Parenthood Assn.*, 297 Or at 573-74 ("To the extent that the rule departs from the statutory policy directive, it 'exceeds the statutory authority of the agency' within the meaning of those words in ORS 183.400(4)(b).").

With that backdrop in mind, we turn to NewSun's specific challenges.

2. *Challenge to OAR 860-029-0120(2)*

NewSun's first challenges PUC's adoption of OAR 860-029-0120(2), which provides:

"Qualifying facilities have the unilateral right to select a purchase period of up to 20 years for a standard power

purchase agreement. Qualifying facilities electing to sell firm output at fixed prices have the unilateral right to a fixed-price term of up to 15 years, subject to the reduction specified in section (6) for a development period that exceeds three years. In addition, the fixed-price term continues to run during the cure period should the qualifying facility fail to meet the scheduled commercial operation date. Qualifying facilities may also select a nonfixed-price term of up to five years to run at the conclusion of the fixed-price term."

NewSun argues that the rule violates ORS 758.525, because that statute requires a 20-year fixed-price term, but the rule only provides for a 15-year fixed-price term for standard contracts.[2]

We start our analysis by determining what ORS 758.525 requires, applying our usual statutory methodology set out in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). That analysis starts with looking at the text of the statute in context. ORS 758.525 provides, in relevant part:

"(1)   At least once every two years each electric utility shall prepare, publish and file with the Public Utility Commission a schedule of avoided costs equaling the utility's forecasted incremental cost of electric resources over at least the next 20 years. Prices contained in the schedules filed by public utilities shall be reviewed and approved by the commission.

"(2)   An electric utility shall offer to purchase energy or energy and capacity whether delivered directly or indirectly from a qualifying facility. Except as provided in subsection (3) of this section, the price for such a purchase shall not be less than the utility's avoided costs. At the option of the qualifying facility, exercised before beginning delivery of the energy or energy and capacity, such prices may be based on:

---

[2] We note that PUC's policy choice of unilateral right to a 15-year fixed-price term in a standard contract precedes the current rulemaking and applies, unchallenged, to nonstandard contracts. *See former* OAR 860-029-0120(3) (July 26, 2018) (former standard contract rule provided: "Qualifying facilities electing to sell firm output at fixed-prices have the unilateral right to a fixed-price term of up to 15 years."); OAR 860-029-0130(2) (nonstandard contract rule provides: "Qualifying facilities electing to sell firm output at fixed prices have the unilateral right to a fixed-price term of up to 15 years.").

"(a)   The avoided costs calculated at the time of delivery; or

"(b)   The projected avoided costs calculated at the time the legal obligation to purchase the energy or energy and capacity is incurred."

NewSun argues that the statutory purpose of requiring a utility to forecast avoided costs for at least 20 years, as set out in subsection (1), is to allow qualifying facilities to enter into a contract using the "projected" avoided costs, as set out in subsection (2). NewSun asserts that the legislature thus intended that qualifying facilities could enter into a 20-year contract with a 20-year fixed-price term. NewSun further argues that its interpretation is supported by the legislature's goals and policies and the legislative history.

We disagree with NewSun's statutory analysis. Nothing in the text of ORS 758.525 expressly requires a 20-year fixed-price term in contracts with qualifying facilities. We also do not read into the statute the implicit requirement that NewSun does. Subsection (1) requires a utility to file, once every two years, a 20-year "forecast" of avoided costs, while subsection (2)(b) references setting a contract price at "projected" avoided costs "calculated at the time the legal obligation to purchase *** is incurred."[3] The text of those two subsections do not refer to the same thing because the words used and the time of calculation differs. Also, notably, subsection (1) does not link the 20-year forecast filing requirement to a required 20-year fixed-price contract term, nor does subsection (2)(b) require a 20-year fixed-price term. Rather, the legislature left the terms and conditions that apply to be determined by PUC. ORS 758.535(2) ("The terms and conditions for the purchase of energy or energy capacity from a qualifying facility shall: (a) Be established by rule by the commission if the purchase is by a public utility[.]"). We

_____

[3] The phrase "time the obligation to purchase the energy capacity or energy and capacity is incurred" has been defined by PUC to mean:

"(a)  The date on which a binding, written obligation is entered into between a qualifying facility and a public utility to deliver energy, capacity, or energy and capacity; or

"(b) The date determined by the Commission."

OAR 860-029-0010(65). That definition was not changed by the 2023 rules.

decline to read into the statute a specific, required contract term that does not exist in the statute's text.[4]

The legislative goals and polices outlined in ORS 758.515 do not change our reading of ORS 758.525. Such legislative policy statements can provide general context for interpreting statutes, but it does not provide a basis for us to read a specific, required contract term into ORS 758.525 that is not articulated in that statute. *See, e.g.*, *Burke v. DLCD*, 352 Or 428, 441, 290 P3d 790 (2012) ("[A] statement of legislative findings, without more, is a slim reed on which to rest an argument that the operative provisions of a statute should be taken to mean something other than what they appear to suggest."); *Sundermier v. PERS*, 269 Or App 586, 595, 344 P3d 1142, *rev den*, 357 Or 415 (2015) ("Statements of statutory policy are also considered useful context for interpreting a statute. Such statements, however, should not provide an excuse for delineating specific policies not articulated in the statutes." (Internal quotations marks and citations omitted.)) Further, nothing in ORS 758.515 itself requires a 20-year fixed-price contract for qualifying facilities. The policy adopted by PUC—providing qualifying facilities the unilateral right to a fixed-price term of up to 15 years—does not, on its face, contravene the goals and policies expressed by the legislature in ORS 758.515.

Finally, we have reviewed the legislative history offered by NewSun and it does not change our view of the text and context of ORS 758.525.[5] Only one of the offered statements, made in writing by the Oregon Department of Energy, suggests what NewSun advocates—that the statute

---

[4] Our reading comports with *Snow Mountain Pine Co. v. Maudlin*, 84 Or App 590, 600-01, 734 P2d 1366, *rev den*, 303 Or 591 (1987), which, taking into account the regulatory scheme, construed ORS 758.525(2)(b) to refer to the actual avoided costs at the time the obligation is incurred, projected over the life of the obligation, and not the 20-year forecasted avoided costs filed under subsection (1). *See also* OAR 860-029-0040(3)(b)(B) ("At the election of the qualifying facility, exercised at the time the obligation is incurred, the avoided costs, or the index rate then in effect if subsection (2)(b) of this rule is applicable, projected over the life of the obligation and calculated at the time the obligation is incurred.").

[5] NewSun offers two statements from the legislative history. The first states:

"The other thing the bill requires that the federal law does not require is that utilities, all utilities, must forecast their avoided cost over a 20-year period looking out into the future. And they have to be willing to enter into contract with power producers based on those forecasted avoided costs."

obligates a utility to enter into a 20-year contract based on the forecasted avoided costs That isolated statement, however, taken in the context of the entire written testimony is not so clear, and tends to suggest only that the contracts would be based on the forecasted avoided costs, which forecasts are provided for at least 20 years. *See* Testimony, Senate Committee on Energy and Environment, June 15, 1983, Ex. B at 3 (Statement of David Philbrick, ODOE). Regardless, even if the statement suggests what NewSun advocates for, it would be contrary to our role as a court to insert a required contract term into ORS 758.525 that does not appear there. We thus give that legislative history little weight. *See Gaines*, 346 Or at 172-73 ("We emphasize again that ORS 174.020 obligates the court to consider proffered legislative history only for whatever it is worth * * *. When the text of a statute is truly capable of having only one meaning, no weight can be given to a legislative history that suggests—or even confirms—that legislators intended something different.").

We conclude that PUC did not exceed its statutory authority in adopting ORS 860-029-0120(2) in any of the ways asserted by NewSun.

### 3. *Challenge to OAR 860-029-0121(5)*

NewSun next challenges PUC's adoption of OAR 860-029-0121(5), which provides:

"A qualifying facility may not commence commercial operation any sooner than 180 days before the scheduled commercial operation date of the standard power purchase agreement unless the purchasing public utility consents to early operation. The purchasing public utility may require

---

Audio Recording, Senate Committee on Energy and Environment, HB 2320, June 15, 1983, Tape 168, Side A (comments of Representative William Bradbury) available at http://records.sos.state.or.us/ORSOSWebDrawer/Record/7372560.

The second statement was written testimony submitted to the same hearing, and provides:

"The provisions in the Bill are generally consistent with federal law. In two areas, HB 2320 goes beyond federal law: it requires avoided costs to be forecasted and, if desired by the facility owner, obligated under contract for at least the next twenty years, and it encourages reasonable wheeling policies."

Testimony, Senate Committee on Energy and Environment, June 15, 1983, Ex. B at 3 (Statement of David Philbrick, ODOE).

a qualifying facility to wait to commence commercial operation until no sooner than 90 days prior to the scheduled commercial operation if the purchasing public utility is unable to accept delivery from the qualifying facility but is obligated to undertake reasonable efforts to obtain transmission service up to 180 days ahead of the scheduled commercial operation date. The qualifying facility must agree to compensate the purchasing public utility for any additional transmission costs associated with commencing operation sooner than 90 days prior to the scheduled commercial operation date."

NewSun argues that the rule violates ORS 758.525(2) and PURPA, because, in contravention of the statutory obligation on public utilities to purchase all energy made available by a qualifying facility, the rule gives public utilities the unilateral right to reject deliveries from a qualifying facility if it is more than 180 days before the scheduled operation date and can limit the purchase if it is more than 90 days early. NewSun also asserts that rule contravenes the goals and policies in ORS 758.515.

We reject NewSun's argument because the rule does not have the effect that NewSun asserts it has. Again, ORS 758.525(2) provides:

"(2)   An electric utility shall offer to purchase energy or energy and capacity whether delivered directly or indirectly from a qualifying facility. Except as provided in subsection (3) of this section, the price for such a purchase shall not be less than the utility's avoided costs. At the option of the qualifying facility, exercised before beginning delivery of the energy or energy and capacity, such prices may be based on:

"(a)   The avoided costs calculated at the time of delivery; or

"(b)   The projected avoided costs calculated at the time the legal obligation to purchase the energy or energy and capacity is incurred."

Under that statute, a qualifying facility can sell energy to a utility either based on pricing at the time of delivery or based on a fixed price at the time of entering into the legal obligation to purchase. In either case, the qualifying facility must choose the option before beginning delivery.

If a qualifying facility chooses a fixed-price contract under subsection (2)(b), and an eligible qualifying facility enters into a standard contract with a public utility, that standard contract is subject to terms and conditions set out in PUC's rules, including the one provided in OAR 860-029-0121(5). Those terms and conditions provide that a key date in standard contracts is the earlier of the commercial operation date or scheduled commercial operation date, because it sets the start of the delivery and purchase obligations under the standard contract. *See, e.g.*, OAR 860-029-0120(4) ("The purchase period of a standard power purchase agreement begins on the earlier of the commercial operation date or the scheduled operation date."); OAR 860-029-0120(5) ("A qualifying facility may specify a scheduled commercial operation date for a standard power purchase agreement subject to the following requirements: ***."); OAR 860-029-0121(1) (starting on the earlier of the commercial operation date or the scheduled operation date the qualifying facility is obligated to deliver and the utility is obligated to purchase the net output delivered). The rule at issue here, OAR 860-029-0121(5), is one of the conditions under a standard contract related to that key date. That is, it governs performance pursuant to the standard contract and, specifically, provides that a qualifying facility cannot unilaterally deliver energy earlier than 180 days before the scheduled commercial operation date under that standard contract.

However, we read nothing in the text of that rule, viewed in the context of the regulatory scheme, that relieves a public utility of the obligation to offer to purchase the qualifying facility's energy, as required under ORS 758.525 and PURPA. If OAR 860-029-0121(5) applies, however, that offer to purchase would not be under the existing standard contract, and the qualifying facility would need to choose a price *before* delivery, as provided in ORS 758.525(2), and subject to PUC's regulations. As a result, we reject NewSun's argument that PUC lacked authority to adopt OAR 860-029-0121(5) based on ORS 758.525 and PURPA. We also summarily reject NewSun's argument that the rule, on its face, contravenes the goals and policies provided in ORS 758.515.

We thus conclude that PUC did not exceed its statutory authority in adopting ORS 860-029-0121(5) in any of the ways asserted by NewSun.

Rules held valid.