550 May 13, 2026 No. 408

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

EASTSIDE BEND, LLC,
an Oregon limited liability company,
*Plaintiff-Appellant,*

*v.*

CALAVERAS II, LLC,
and Oregon limited liability company;
Cottages at Village Park, LLC,
an Oregon limited liability company;
Scholls Development, LLC,
an Oregon limited liability company;
Saiid Behboodi and Bahram Behboodi, individuals;
and B&B Realty Investors, LLC,
an Oregon limited liability company,
*Defendants-Respondents.*

CALAVERAS II, LLC,
an Oregon limited liability company;
Cottages at Village Park, LLC,
an Oregon limited liability company;
Scholls Development LLC,
an Oregon limited liability Company;
Saiid Behboodi; and Bahram Behboodi, individuals,
*Counterclaim Plaintiffs-Respondents,*

*v.*

EASTSIDE BEND, LLC,
an Oregon limited liability company;
Gary G. Miller, an individual;
and Calaveras Homeowner's Association,
an Oregon nonprofit corporation,
*Counterclaim Defendants-Appellants.*

Deschutes County Circuit Court
20CV01839; A182014

Beth M. Bagley, Judge.

Argued and submitted February 18, 2025.

Michael H. McGean argued the cause for appellants. Also on the briefs was Francis Hansen & Martin LLP.

Michael W. Peterkin argued the cause for respondents. Also on the joint answering brief was Peterkin Burgess, Stephanie C. Kucera and Hart Wagner LLP.

Before Ortega, Presiding Judge, Lagesen, Chief Judge, and Hellman, Judge.*

HELLMAN, J.

General judgment on first counterclaim for declaratory relief reversed and remanded; portions of general judgment on second counterclaim for corporate relief set out in paragraphs (2)(a), (d), and (e) reversed and remanded; otherwise affirmed. Supplemental judgment for attorney fees and costs reversed.

_____

* Lagesen, Chief Judge *vice* Mooney, Senior Judge.

**HELLMAN, J.**

Plaintiff Eastside Bend, LLC (Eastside) appeals from a general judgment resolving defendants' two counterclaims, one for declaratory relief under ORS chapter 28 and another for corporate relief under ORS chapter 65, in favor of defendants.[1] Eastside also appeals the supplemental judgment awarding attorney fees and costs to defendants. Eastside raises three assignments of error. Its first and second assignments challenge the trial court's ruling on defendants' first counterclaim that declares that Eastside, the declarant of a planned community created under the Oregon Planned Community Act (OPCA), transferred its special declarant rights to defendant Calaveras II, LLC (defendant Calaveras) "by contract" and that, as a result, Eastside and defendant Calaveras are "joint declarants" of that planned community. Resolving those assignments requires us to first examine whether the trial court erred in determining that ORS 94.623 does not provide the exclusive method of transferring special declarant rights in planned communities subject to the OPCA. After undertaking a *Gaines* analysis and concluding that ORS 94.623 provides the sole method of transfer, we conclude that no such transfer occurred between Eastside and defendant Calaveras and that, as a matter of law, Eastside remains the sole declarant of the planned community. Accordingly, we resolve the first and second assignments in Eastside's favor, and we reverse and remand for entry of a corrected declaratory judgment.

In its third assignment of error, Eastside argues that the trial court erred in granting various forms of corporate relief under defendants' second counterclaim. Defendants had requested judicial review of numerous corporate actions undertaken by Eastside through its sole member Gary Miller, in his capacity as the self-appointed director of the planned community's homeowners association (HOA). For the reasons explained below, we affirm the trial court's ordered corporate relief, in part. However, we reverse and remand for the trial court to reconsider particular forms of granted corporate relief that flowed from erroneous legal

---

[1] Throughout this opinion, "defendants" refers to defendant Cottages at Village Park, LLC and defendant Calaveras II, LLC, collectively.

conclusions and unsupported factual findings, both of which we identify in this opinion. Because we reverse portions of the general judgment, we reverse the associated award of attorney fees and costs in the supplemental judgment.

This case involves technical and complex legal issues pertaining to planned communities, our first interpretations of several statutory provisions relating to planned communities, and a complex litigation history. Before turning to our legal analysis, we provide the following roadmap to help readers more easily engage with the opinion and navigate to those portions of our analysis that are most relevant to their situations.

In section I, we provide an overview of the statutory scheme that governs planned communities in Oregon.

In section II, we provide the facts of this case that give rise to the assignments of error that we address in this opinion.

In the first part of section III, we address Eastside's first and second assignments of error. That requires us to interpret ORS 94.623 to determine whether it provides the sole method by which special declarant rights can be transferred in a planned community and consider whether the OPCA permits joint declarants in a planned community. As part of our statutory interpretation, we also provide a history of the OPCA.

In the second part of section III, we address Eastside's third assignment of error. We evaluate whether ORS 65.281, ORS 65.327, ORS 28.010, and/or ORS 28.050 permit a trial court to remove an HOA director and nullify certain HOA actions taken by that challenged director. In that analysis, we also determine the correct scope of ORS 94.574, which establishes one method for forming a planned community's HOA. We then explain our remedy as to Eastside's third assignment.

### I.   STATUTORY FRAMEWORK GOVERNING PLANNED COMMUNITIES

To help ground our resolution of this complex case, we initially trace the basic statutory scheme that governs planned communities in this state: the OPCA, ORS 94.550

to 94.783. The OPCA regulates subdivisions that have a particular pattern of ownership, specifically those that

> "result[] in a pattern of ownership of real property and all the buildings, improvements and rights located on or belonging to the real property, in which the owners collectively are responsible for the maintenance, operation, insurance or other expenses relating to any property within the planned community, including common property, if any, or for the exterior maintenance of any property that is individually owned."

ORS 94.550(21)(a) (defining "planned community").

Before the conveyance of any lot in a planned community, the creator, or "declarant," of the community must generally organize an HOA as a nonprofit corporation and record bylaws on behalf of the HOA. ORS 94.550(9); ORS 94.625(1); *see also* ORS 94.635 (setting out requirements for HOA bylaws). Although the OPCA assumes that the declarant is responsible for administering the planned community at the outset, the OPCA requires that administrative responsibility eventually transition from the declarant to the HOA, whose membership is composed of the individual owners of lots in the community, through a process called "turn over." ORS 94.550(16), (27); ORS 94.604 - 94.616. The OPCA establishes baseline requirements for HOA governance, such as those related to appointing board directors, holding meetings, and voting. *See, e.g.*, ORS 94.639 - 94.640; ORS 94.644; ORS 94.650; ORS 94.658 - 94.661.

Importantly, before conveying any lot, the declarant must also record a "declaration" of the planned community. ORS 94.565(2); *see also* ORS 94.550(11) (defining "declaration" as the instrument that "establishes a planned community, and any amendments to the instrument"). That recorded declaration "contains covenants, conditions and restrictions that are binding upon lots in the planned community or that impose servitudes on the real property." ORS 94.550(24); *see also* ORS 94.580(2) (listing the items that must be included in the declaration). In addition, the declaration must describe "any special declarant rights," meaning those rights "reserved for the benefit of the declarant." ORS 94.550(25); ORS 94.580(2)(g). Special declarant rights

may include the right to construct improvements in the planned community, the right to convert lots into common property, or any rights that afford the declarant enhanced administrative control over the HOA, such as the right to appoint or remove HOA board directors or the right to a weighted vote in HOA affairs compared to other lot owners. ORS 94.550(10), (25)(a), (25)(c), (25)(e); ORS 94.600(1).

As particularly pertinent to this case, the OPCA expressly allows for the transfer of special declarant rights from a declarant to a "successor declarant" and provides several methods for doing so in ORS 94.623. While the declarant is the creator of a planned community, a "successor declarant" is the "transferee of any special declarant right"; in other words, the successor declarant is the recipient of any special declarant right that has been reserved in the declaration and transferred to them. ORS 94.550 (9), (26).

Having reviewed the basic statutory framework that governs planned communities, we now turn to the factual background of this dispute.

## II.  FACTUAL BACKGROUND

At its core, this case boils down to a complex financial and real estate development relationship formed between two developers, Eastside and defendant Calaveras, that took an unexpected and adverse turn after a business deal went uncompleted. That failed business endeavor resulted in Eastside and defendant Calaveras each owning multiple lots and common area tracts in a 76-lot subdivision intended to be developed as a planned community of townhouses under the OPCA (the Calaveras planned community). When disputes arose over decision-making as to the construction and aesthetics of the Calaveras planned community, and perhaps other matters that are not clearly articulated in the record, the two developers' business relationship rapidly deteriorated and led to this litigation.[2]

---

[2] This case sits within a string of litigation reflecting an ongoing power struggle between the parties over several years. See, e.g., Eastside Bend, LLC v. Calaveras II, LLC, 323 Or App 313 (2022) (nonprecedential memorandum opinion); Wolfston v. Eastside Bend, LLC, 327 Or App 456, 536 P3d 1 (2023), rev den, 371 Or 825; 372 Or 560 (2024).

It all began in 2013, when Eastside purchased the subdivision at issue. In 2015, Eastside recorded the "Declaration of Protective Covenants, Conditions and Restrictions" (CC&Rs) and the Bylaws for the subdivision, then called "Cottages at Parkway Villages," which indicate that the property would be developed as a planned community under the OPCA and designate Eastside as the planned community's declarant. Among other things, the CC&Rs also provide for the creation of an HOA, an Architectural Review Committee (ARC) that enforces the planned community's architectural standards, and a number of special declarant rights that endow the declarant with enhanced control over the planned community's affairs.[3] Throughout our analysis, we discuss the specific provisions of the Calaveras planned community's CC&Rs and Bylaws (together, the Governing Documents) that are relevant to our resolution of each assignment of error.

In 2018, Eastside entered a contract to sell the entire subdivision to defendant Calaveras in three phases. Defendant Calaveras successfully closed the first two phases, through which they acquired 53 of the 76 lots in the subdivision, including several common area tracts.

In 2019, Eastside and defendant Calaveras jointly replatted the subdivision, which renamed it as "Calaveras." Later that year, defendant Calaveras failed to timely close on the purchase of the third and final phase due to a lack of financing. Eastside therefore has maintained ownership of 23 lots and multiple common area tracts.

At some point, defendant Calaveras conveyed some of its lots to other developers, including defendant Cottages at Village Park, LLC (defendant Cottages).[4] Defendants began constructing townhouses on their owned lots without

---

[3] Those reserved special declarant rights include the right to construct upon, maintain, and have easements to access the common areas so long as Eastside owns a lot in the planned community and the right to a period of declarant control until turn over occurs. *See* ORS 94.550(10) (defining "declarant control" as "any special declarant right relating to administrative control of a homeowners association").

[4] We refer to the owners of lots in the Calaveras planned community that are not Eastside, defendant Calaveras, or defendant Cottages as "the other lot owners" throughout this opinion.

first receiving ARC's approval, which Eastside took issue with. Defendant Calaveras also improved its common area tracts at its own expense.

At the crux of this contentious dispute is the conflict over who, among Eastside and defendant Calaveras, is declarant of the Calaveras planned community and therefore imbued with special declarant rights that allow increased control over the community's administration. Since defendant Calaveras closed on the first phase of lots, it has repeatedly asserted that it is a successor declarant with special declarant rights.[5]

In contrast, Eastside has maintained that it is the sole declarant because no transfer of special declarant rights occurred. It therefore has taken numerous actions pursuant to its powers, under both the OPCA and the Governing Documents, as the purported exclusive declarant of the Calaveras planned community. Those include Eastside's appointment of its member Miller as the sole ARC member and sole director of the Calaveras Homeowner's Association (Calaveras HOA), the latter of which Eastside formed in January 2020 as a nonprofit corporation. Miller, in his capacity as the Calaveras HOA director, undertook numerous actions that disadvantaged defendants and the other lot owners. For example, Miller suspended the voting rights of defendants and the other lot owners, which then enabled him to unilaterally adopt a controversial amendment to the CC&Rs (Third Amendment to the CC&Rs).

Discontent with the governance of the Calaveras planned community, defendants then filed the counterclaims that are at issue in this appeal against Eastside, the Calaveras HOA, and Miller, in his capacities as Eastside's sole member and the Calaveras HOA's sole director.[6] Defendants' first counterclaim sought declaratory judgment under ORS chapter 28. Among other things, defendants requested a declaration that defendant Calaveras is the lawful successor declarant of the Calaveras planned community

---

[5] Specifically, we understand defendant Calaveras to have asserted that it became declarant at least to those lots transferred to them.

[6] Eastside's underlying single claim for injunctive relief was dismissed by a limited judgment, which is not the subject of this appeal.

and therefore has special declarant rights. In their second counterclaim, under ORS 65.281 and ORS 65.327, defendants requested judicial review of several of the Calaveras HOA's corporate actions and judicial removal of Miller as HOA director and ARC member.

After holding a trial, the trial court entered a general judgment that decided both counterclaims in defendants' favor. Significantly, under defendants' first counterclaim for declaratory relief, the court determined that ORS 94.623 does not set out "the only way in which declarant rights may be transferred." As a result, the court declared that Eastside had transferred special declarant rights to defendant Calaveras "by contract, consistent with *** the CC&Rs" and declared that Eastside and defendant Calaveras are "joint declarants as to the entire community" with special declarant rights. As to defendants' second counterclaim, the court issued several forms of corporate relief, including the nullification of the Calaveras HOA's actions in totality, the nullification of the Third Amendment to the CC&Rs, and the removal of Miller as the Calaveras HOA director and ARC member. The general judgment also incorporated a letter opinion, which includes general findings that support the court's granted relief on defendants' second counterclaim.[7] Those findings are included in full under our discussion of Eastside's third assignment of error.

The trial court later entered a supplemental judgment, which awarded attorney fees and costs to defendants. Eastside appeals from the general judgment and the supplemental judgment.

## III.   ANALYSIS

A.  *First and Second Assignments of Error*

Because the first and second assignments of error both concern the trial court's ruling on defendants' first

---

[7] Despite the lengthy and contentious litigation over complex and novel areas of law and a voluminous factual record, none of the parties requested that the trial court make special findings under ORCP 62, and regrettably so. The parties dispute nearly every aspect of this case and present drastically different representations about the state of the record. The lack of special findings significantly impeded this court's review and analysis.

counterclaim for declaratory judgment and are closely related, we address them together. In its first assignment, Eastside argues that the trial court erred when it determined that Eastside had transferred special declarant rights in the Calaveras planned community to defendant Calaveras "by contract, consistent with *** the CC&Rs." In its second assignment, Eastside argues that the trial court erred in declaring Eastside and defendant Calaveras to be "joint declarants as to the entire community."[8] For the reasons stated below, we agree with Eastside on both counts; accordingly, we reverse the trial court's award of declaratory relief and remand for entry of a judgment that correctly declares the parties' rights under defendants' first counterclaim, consistent with this opinion.

In resolving the first counterclaim in favor of defendants, the trial court issued the following declaration:

> "*[Eastside] and Defendant Calaveras are joint declarants as to the entire community.* [Eastside] transferred declarant rights upon sale and closing of Phase 1 and Phase 2. [Eastside] contracted to sell, and [defendant Calaveras] contracted to purchase declarant rights on a phase-by-phase basis. [Eastside] could have, but did not, reserve or retain sole declarant status in the Contract of Sale for Phase 1 and Phase 2, and those rights ultimately passed to [defendant Calaveras]. *While ORS 94.623 describes the manner in which declarant rights may be transferred, it is*

---

[8] Defendant Calaveras argues that Eastside did not "precisely identify the challenged ruling" connected to the declaratory judgment in its first and second assignments, as required by ORAP 5.45(3). To be sure, Eastside could have more clearly presented its assignments on appeal. However, it is apparent that Eastside is challenging the trial court's rulings on defendants' declaratory judgment counterclaim. We therefore conclude that Eastside satisfied ORAP 5.45(3).

We also reject defendant Calaveras's argument that Eastside invited error as to its second assignment. In defendant Calaveras's view, Eastside's request that the proposed judgment be amended to resolve ambiguities as to "what lots or properties" that Eastside and defendant Calaveras's joint declarant status extended to, which resulted in the court adding the language "as to the entire community" in the general judgment, constitutes invited error. However, Eastside's request for *clarification* as to the scope of its joint declarant status was not an abandonment of its underlying legal position that Eastside is the sole declarant. In other words, Eastside was not "actively instrumental" in bringing about the alleged error; the trial court had already determined Eastside and defendant Calaveras to be joint declarants as to the entire community, and Eastside merely requested that the judgment clearly reflect that ruling, even if erroneous. *Jones v. Mears*, 285 Or App 799, 802, 398 P3d 461 (2017).

> *not the only way in which declarant rights may be trans-*
> *ferred. Here, declarant rights to Phase 1 and Phase 2 were*
> *transferred by [Eastside] to [defendant Calaveras] by con-*
> *tract, consistent with the requirements of Articles 1.16 and*
> *12.3 of the CC&Rs.* Subsequently, [defendant Calaveras]
> received control of, and ha[s] exclusively developed and
> maintained common property within Phase 1 and Phase 2,
> and ha[s] performed all declarant obligations with respect
> to those Phases with full knowledge of, and without con-
> tribution from, [Eastside]. [Defendant Calaveras] is joint
> declarants with [Eastside] and ha[s] special declarant
> rights in connection with ownership of common area tracts
> and lots from the date of purchase for as long as they are
> retained."

(Emphases added.) The portions of the declaration that are most relevant to our resolution of Eastside's first and second assignments are italicized and are discussed in greater detail throughout our analysis.

The applicable standard of review for a declaratory judgment proceeding "depends on the underlying nature of the claim and issues presented on appeal." *Rudder v. Hosack*, 317 Or App 473, 480-81, 506 P3d 1156, *rev den*, 370 Or 56 (2022). Here, both assignments stem from the trial court's determination that ORS 94.623 does not set out "the only way in which declarant rights may be transferred," an interpretation that Eastside contests on appeal. As such, resolving Eastside's first and second assignments requires us to first address whether ORS 94.623 provides the exclusive method of transferring special declarant rights in planned communities regulated by the OPCA. We review that question of statutory interpretation for legal error. *Id.* at 481.

We ultimately conclude that ORS 94.623 provides the sole method through which special declarant rights may be transferred in a planned community subject to the OPCA and consequently resolve Eastside's first and second assignments in its favor. However, because Oregon appellate courts have had few occasions to apply the OPCA in the over four decades since its enactment, and because this case requires us to interpret several of its provisions, we find it helpful to first provide a brief background on the OPCA's history.

1.  *History of the Oregon Planned Community Act*

The OPCA has its roots in the Oregon Condominium Act (OCA), ORS 100.005 to 100.990. First enacted in 1963, the OCA reflects the legislature's initial attempt to regulate development projects that include commonly owned property governed by HOAs; specifically, condominiums.[9] Or Laws 1963, ch 541.

However, in the decades following the OCA's enactment, developers seeking to avoid government oversight soon began creating common-interest property projects with ownership structures distinct from condominiums. Tape Recording, House Committee on Housing and Urban Development, HB 2013, Feb 17, 1981, Tape 26, Side A (statement of Betty Niven, Oregon State Housing Council Chair); Tape Recording, House Committee on Judiciary, Subcommittee on Civil Law, HB 3912, Apr 25, 2001, Tape 85, Side A (statement of Rich Vial, Condominium Working Group member). In response, in 1981, the legislature passed the OPCA to fold those noncondominium subdivisions, now known as "planned communities," into state regulation. Or Laws 1981, ch 782, § 3. Like condominiums, planned communities have commonly owned property managed by an HOA. *Compare* ORS 100.005(19) (providing for collectively owned property under the OCA), *with* ORS 94.550(7) (same, but under the OPCA); *compare* ORS 100.405(1) (requiring the formation of HOAs for condominiums under the OCA), *with* ORS 94.625 (same, but for planned communities under the OPCA).

The legislature incorporated several legislative findings into the OPCA, which evidence its intent to bring stability, consistency, and transparency to Oregon's planned communities. ORS 94.560. For example, the legislature noted that planned communities and their HOAs had "experienced problems from the lack of statutory provisions." ORS 94.560(3). Therefore, the legislature found it necessary "to assure proper maintenance of the projects so that the investment of the owners and the appearance of Oregon communities are protected," such as by "establish[ing] basic statutory

---

[9] The OCA was originally titled the "Unit Ownership Act." Or Laws 1963, ch 541, § 1.

requirements for disclosure to first and subsequent buyers, for the organization of the homeowners association, and for a process by which administrative responsibility for the planned community is transferred from the developer to the association of individual owners." ORS 94.560(5), (6).

The legislative history also reflects a concern with meeting the needs of both developers and those living in planned communities. The drafting of the original OPCA was heavily motivated by consumer protection concerns and involved many stakeholders. Tape Recording, House Committee on Housing and Urban Development, HB 2013, Feb 17, 1981, Tape 26, Side A (statement of Betty Niven, State Housing Council Chair); Tape Recording, Senate Judiciary Committee, SB 1206, Apr 22, 1999, Tape 142, Side A (statement of Rich Vial, Condominium Working Group member). For example, the Condominium Working Group (CWG), an Oregon-based industry coalition that has reviewed and proposed legislation relating to common-interest projects since the 1970s, participated in its adoption.[10] *Id*. In addition, Betty Niven, a leading OPCA advocate and chair of the State Housing Council Subcommittee for the OPCA's initial enactment, identified the OPCA's "basic purpose" as "develop[ing] statutory criteria that will assist in making planned communities places that are livable, governable, and marketable," where "[m]arketable means not just marketable to a first buyer but to a series of buyers for the life of the development." Testimony, House Committee on Housing and Urban Development, HB 2013, Mar 10, 1981, Ex H (statement of Betty Niven, State Housing Council Chair); Exhibit D, Senate Judiciary Committee, SB 1206, Apr 22, 1999 (submission of Barbara Kanz, CWG member).

The OPCA's proponents were aware that, given the nascency of planned communities and their regulation, the legislation's original iteration would not be its last. Rather, it was "well understood" that the OPCA would require "fine-tun[ing]" to meet the needs of both buyers and developers.

---

[10] Other stakeholders included representatives from the Association of Oregon Counties, League of Oregon Cities, Oregon State Home Builders Association, and State Housing Council. Tape Recording, House Committee on Housing and Urban Development, HB 2013, Feb 17, 1981, Tape 26, Side A (statement of Betty Niven, Oregon State Housing Council).

Tape Recording, Senate Judiciary Committee, SB 1206, Apr 22, 1999, Tape 142, Side A (statement of Howard Feuerstein, CWG member). And in fact, informed by its members' on-the-ground observations of regulatory and litigation trends within Oregon's planned communities, the CWG has proposed numerous amendments over the years. As a result, the legislature has periodically updated the OPCA to bring more of Oregon's planned communities within its statutory framework, to refine and bring clarity to its operation, and, where appropriate, to harmonize the OCA and OPCA provisions that govern HOAs. *See, e.g.*, Or Laws 1999, ch 677; Or Laws 2001, ch 756; *see also* Tape Recording, Senate Judiciary Committee, SB 1206, Apr 22, 1999, Tape 142, Side A (statement of Rich Vial, CWG member) (describing one of the 1999 amendment's purposes as moving the OCA and OPCA "closer together" to reduce structural differences between condominium HOAs and planned community HOAs).

2. *ORS 94.623 provides the exclusive manner of transferring special declarant rights.*

Again, resolving Eastside's first and second assignments requires us to first determine whether the trial court erroneously concluded that ORS 94.623 does not provide the "only way in which declarant rights may be transferred." We review that underlying question of statutory interpretation for "errors of law, seeking to give effect to the intent of the legislature as demonstrated by the text in context and any helpful legislative history." *Bellshaw v. Farmers Ins. Co.*, 373 Or 307, 317, 567 P3d 434 (2025) (citing *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)). Upon examining ORS 94.623's text, context, and legislative history, we conclude that the trial court erred because ORS 94.623 establishes the exclusive manner of transferring special declarant rights in a planned community subject to the OPCA.

When interpreting a statute, we start with its text. *See Gaines*, 346 Or at 171 ("[T]here is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." (Internal quotation marks omitted.)). As relevant here, ORS 94.623 provides:

"(1)   Except as otherwise provided in subsections (2) and (3) of this section, a developer, vendor under a land sale contract, mortgagee of a mortgage or beneficiary of a trust deed affecting the declarant's interest in the property shall acquire all special declarant rights of the transferor upon transfer by the declarant or prior successor declarant of all of such transferor's interest in a planned community, unless:

"(a)   The conveyance evidences an intent not to transfer any special declarant rights;

"(b)   An instrument executed by the transferor and the transferee evidences an intent not to transfer any special declarant rights and is recorded in the office of the recording officer of every county in which the property is located; or

"(c)   The transferee executes an instrument disclaiming any right to exercise any special declarant rights and such instrument is recorded in the office of the recording officer of every county in which the property is located.

"(2)   A transferee under subsection (1) of this section shall acquire less than all special declarant rights if:

"(a)   The conveyance from the transferor or an instrument executed by the transferor and the transferee evidences an intent to transfer less than all special declarant rights and states the specific rights being transferred, and such instrument is recorded in the office of the recording officer of every county in which the property is located; or

"(b)   The transferee executes an instrument disclaiming specific special declarant rights and the instrument is recorded in the office of the recording officer of every county in which the property is located.

"* * * * *

"(4)   A declarant or a successor declarant may transfer all or less than all of the transferor's special declarant rights to a transferee, whether or not any interest in real property is conveyed, by an instrument executed by the declarant or successor declarant and the transferee evidencing an intent to transfer all or specific special declarant rights, which instrument shall be recorded in the office of the recording officer of every county in which the property is

located. If the transfer is not subject to subsection (1) of this section, it shall also bear the written consent of any holder of a blanket encumbrance on the planned community.

"(5)   An instrument disclaiming or transferring special declarant rights shall be properly acknowledged as provided by law."

By its terms, ORS 94.623 governs all possible situations in which special declarant rights are transferred from a declarant to a successor declarant. The first occurs when the declarant conveys "all of [their] interest in a planned community." ORS 94.623(1). In that case, the successor declarant "shall" acquire all the special declarant rights. The second situation is an exception to the first, which occurs when a declarant conveys the entirety of their interest in a planned community, but specifically retains all their special declarant rights, either through the conveyance itself, or a separate, recorded instrument. ORS 94.623 (1)(a) - (c). The third situation occurs when the declarant conveys the entirety of their interest in a planned community but reserves some specific special declarant rights; again, through the conveyance itself or a separate, recorded instrument. ORS 94.623(2). The fourth occurs when the declarant conveys none or less than their entire interest in the planned community but nevertheless transfers all their special declarant rights to a transferee; again, through a separate, recorded instrument. ORS 94.623(4). And the fifth, and final, situation occurs when the declarant conveys none or less than their entire interest in the planned community but still transfers some specific special declarant rights to a transferee; again, through a separate, recorded instrument. *Id*. Because the statute's text covers all possible situations, it evidences a legislative intent to act as the sole method by which special declarant rights can be transferred.

Two aspects of the relevant context of ORS 94.623 also support a conclusion that it provides the exclusive method for the transfer of special declarant rights. First, as discussed above, the legislature included several legislative findings in enacting the OPCA, which demonstrate the legislature's intent to better protect purchasers of lots in planned communities. ORS 94.560; *see Sundermier v. PERS*, 269 Or App 586,

595, 344 P3d 1142, *rev den*, 357 Or 415 (2015) ("Statements of statutory policy are *** considered useful context for interpreting a statute."). Allowing parties to transfer special declarant rights without ensuring the safeguards that are found in the statute would frustrate that legislative intent.

Second, considering ORS 94.623 together with ORS 94.622 supports the conclusion that ORS 94.623 provides the exclusive method of transfer. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (explaining that the "context of the statutory provision at issue *** includes *** other related statutes"). ORS 94.622 establishes a very specific division of obligations and liabilities between a declarant and successor declarant upon the transfer of any special declarant right. For example, a declarant remains responsible for liabilities arising before the transfer of special declarant rights but is relieved of any liabilities arising after the transfer of all their special declarant rights. ORS 94.622(3)(a), (c); ORS 94.622(4)(b). In contrast, a declarant that retains any special declarant right remains liable for any declarant obligations imposed by the OPCA, declaration, or bylaws and is jointly and severally liable with the successor declarant for the successor declarant's obligations "that relate to the special declarant rights." ORS 94.622(3)(b). Allowing the transfer of special declarant rights through extra-statutory methods risks inviting ambiguity and protracted litigation over who among a declarant and successor declarant is liable for a breach related to declarant obligations or special declarant rights. The legislature's intent to avoid those types of outcomes provides further contextual support that special declarant rights may be transferred only via ORS 94.623's unambiguous methods.

Finally, the legislative history supports an interpretation that ORS 94.623 provides the exclusive method of transferring special declarant rights. *See Gaines*, 346 Or at 172 (stating that courts may consider legislative history "after examining text and context, even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis").

Today's ORS 94.623 is the product of several amendments to both the OCA and the OPCA through which

the legislature has incrementally clarified the process of transferring special declarant rights in a manner that consistently provides current and prospective lot owners with notice that a transfer has occurred.

The origins of ORS 94.623 can be traced back to a 1981 amendment to the OCA, which intended to standardize condominium governance, clarify developers' rights, and provide prospective condominium purchasers with greater disclosures as to "what they are buying." Testimony, Senate Committee on Local Government, Urban Affairs, and Housing, HB 3132, July 13, 1981, Ex C (statement of Rep Shirley Gold). Among other things, the OCA amendment defined, for the first time, "declarant," "special declarant right," and "successor declarant," and added the two statutory sections that are the origins of the OPCA's ORS 94.622 and ORS 94.623. Or Laws 1981, ch 647, §§ 1, 28, 29. A proponent of the amendment testified that those newly created OCA provisions were meant to "make it very clear" that another person could step into the shoes and finish a development of a declarant who could not or did not want to complete a condominium project, and that they could also exercise special declarant rights reserved by the declarant. Tape Recording, House Committee on Housing and Urban Development, HB 3132, June 2, 1981, Tape 141, Side B (statement of Barbara Kanz, Oregon Real Estate Division).

Then, in 1989, in response to a flood of litigation about the extent of a successor declarant's liability, the legislature again amended the OCA to continue refining the successor declarant's responsibilities and liabilities and the manner of transferring special declarant rights within Oregon's condominium communities. Or Laws 1989, ch 595, §§ 11, 12; Tape Recording, Senate Committee on Business, Housing, and Finance, SB 1135, Apr 17, 1989, Tape 72, Side A (statement of Rich Vial, Oregon Bar Association, Real Estate and Land Use Section, Legislative Subcommittee Chair); Exhibit H, Senate Committee on Business, Housing, and Finance, SB 1135, Apr 17, 1989 (submission of Rich Vial). Significantly, the 1989 amendment fleshed out the OCA provision pertaining to the transfer of special declarant rights from a single paragraph to a more comprehensive

framework that has largely persisted today in both the OCA and OPCA. *Compare* Or Laws 1989, ch 595, § 12 *with* ORS 94.623(1) - (4).

In 1999, to harmonize the OPCA with the OCA, the legislature amended the OPCA to also provide for the transfer of special declarant rights within Oregon's planned communities. Or Laws 1999, ch 677, §§ 34, 35. The 1999 amendment borrowed language from the OCA in adding ORS 94.622 and ORS 94.623 to the OPCA. *Compare* ORS 94.622 (1999), *amended by* Or Laws 2011, ch 532, § 1, *with* ORS 100.220 (1999), *amended by* Or Laws 2011, ch 532, § 8, *amended by* Or Laws 2017, ch 112, § 1; *compare* ORS 94.623 (1999), *amended by* Or Laws 2011, ch 532, § 2, *amended by* Or Laws 2017, ch 112, § 2, *with* ORS 100.225. Thus, declarants in Oregon's planned communities became able to transfer, by statute, their special declarant rights either implicitly or explicitly: either the declarant conveys their entire interest in the planned community, or an instrument has been executed and recorded that transfers special declarant rights. Or Laws 1999, ch 677, § 35.

Since 1999, the legislature has enacted other amendments to ORS 94.623 to continue fine-tuning the statutory rules guiding the transfer of special declarant rights. Or Laws 2011, ch 532, § 2; Or Laws 2017, ch 112, § 2. In doing so, the legislature has shown its commitment to continuously revisit and revise the OPCA's robust statutory framework to enhance its usability for those developing, living in, managing, and litigating matters related to Oregon's planned communities. That serves as compelling evidence that the legislature did not intend to enable declarants and successor declarants to circumvent the statutory requirements and transfer special declarant rights through alternative means.

In sum, the text, context, and legislative history of ORS 94.623 persuade us that that statute provides the exclusive method of transferring special declarant rights in planned communities regulated by the OPCA, and the trial court erred in ruling otherwise. Because the trial court's determination that Eastside transferred special declarant rights flowed from the faulty legal premise that those rights

may be transferred via extra-statutory methods, we conclude that the trial court erred in declaring that Eastside had transferred special declarant rights to defendant Calaveras "by contract, consistent with *** the CC&Rs" because ORS 94.623's requirements went unmet.[11] *See Rudder*, 317 Or App at 418 (reviewing, for legal error, whether trial court properly applied law to facts). Accordingly, we resolve the first assignment of error in Eastside's favor.

3.   *The OPCA does not permit joint declarants of planned communities.*

Relatedly, in its second assignment of error, Eastside argues that the trial court erred in declaring Eastside and defendant Calaveras to be "joint declarants" with special declarant rights "as to the entire community." We agree with Eastside. Defendant Calaveras is not a "joint declarant" as to the entire Calaveras planned community, nor is it a "joint declarant" with respect to solely the lots and common area tracts that it owns.[12]

While the OPCA allows for successive ownership as to some or all declarant rights, it does not permit joint ownership of special declarant rights. Again, we review that underlying question of statutory interpretation for legal error, starting, under *Gaines*, with the statute's text and context.

ORS 94.550 sets forth the definitions that apply in the OPCA. ORS 94.550(9) defines "declarant" and ORS 94.550(26) defines "successor declarant," but ORS 94.550

---

[11] Defendant Calaveras relies on the purchase agreement, the warranty deeds, the 2019 replat, and its ownership of common area tracts as evidence of the transfer of special declarant rights. We observe that none of the referenced documents mention declarant rights, or a transfer thereof, and the purchase agreement was not recorded. It thus appears that that evidence is insufficient to permit defendant Calaveras to establish that a transfer occurred by way of a recorded instrument "evidencing an intent" to transfer any special declarant rights, as required by ORS 94.623(4). And because Eastside has retained ownership of 23 lots and several common area tracts in the Calaveras planned community, no transfer could have occurred via ORS 94.623(1) - (2), either.

[12] The trial court's language in the general judgment is not clear as to whether the trial court declared defendant Calaveras to be a "joint declarant" as to the entire Calaveras planned community or merely "in connection with" the common area tracts and lots owned by defendant Calaveras. However, our analysis forecloses the possibility of defendant Calaveras being a "joint declarant" in either sense.

does not provide a definition of "joint declarant." And the term "joint declarant" is not found anywhere in the OPCA.

In addition, although ORS 94.623 provides a method to transfer special declarant rights, it provides no mechanism for jointly owning or managing special declarant rights. Moreover, ORS 94.622 explains how obligations and liabilities are to be distributed between the transferor and transferee of special declarant rights but is silent as to the method for apportioning obligations and liabilities between joint declarants. The text and context of those statutes thus demonstrate that the OPCA contemplates successive ownership of special declarant rights, but not joint ownership.

Such an interpretation is also consistent with the legislature's intent, as expressed in the legislative history, to bring stability, consistency, and transparency to Oregon's planned communities. Allowing multiple parties to jointly hold the rights to develop and manage a planned community without any statutory framework for how those declarant rights and associated obligations would be jointly managed decreases transparency to purchasers and increases the possibility of administrative or legal disputes.

Thus, defendant Calaveras is an owner of lots and common area tracts in the Calaveras planned community but is not a joint declarant for the community in total, or as to the properties that it owns.[13] The trial court therefore erred when it declared that Eastside and defendant Calaveras are "joint declarants" in the Calaveras planned community.

---

[13] To be sure, the fact that Eastside is the sole declarant while defendant Calaveras owns common property in the planned community may create some confusion when it comes time to turn over administrative control to the HOA. *See* ORS 94.616(3)(b) (requiring the declarant, at the turn over meeting, to deliver "[a] deed to the common property in the planned community, unless otherwise provided in the declaration"); *see also* Section 5.5 of the CC&Rs (requiring "Declarant [to] cause fee simple title to the Common Areas to be conveyed to the [HOA]" by turn over). However, that does not mean that defendant Calaveras is a joint declarant with Eastside; the OPCA does not preclude a nondeclarant from owning common property. *See* ORS 94.550(7) (defining "common property" to include "any real property or interest in real property within a planned community which is *** designated in the declaration or the plat for transfer to the association"); *see also* Section 1.11 of the CC&Rs (defining "Common Areas" to include "all areas labeled as such on the [2019] Plat of CALAVERAS").

In sum, we resolve Eastside's first and second assignments of error in its favor. As a result, we reverse and remand the portion of the general judgment awarding declaratory relief in favor of defendants for entry of a corrected judgment on defendants' first counterclaim, consistent with our determinations (1) that ORS 94.623 provides the exclusive method for transfer of special declarant rights in planned communities under the OPCA and (2) that the OPCA does not provide for "joint declarants" of planned communities.

## B.   *Third Assignment of Error*

In its third assignment of error, Eastside contends that the trial court erred in granting the following corporate relief under defendant Calaveras's second counterclaim: (1) nullification of the Third Amendment to the CC&Rs; (2) nullification of all actions taken by the Calaveras HOA; (3) removal of Eastside's only member, Miller, as the sole director of the Calaveras HOA; and (4) removal of Miller as the sole member of the ARC. As we explain below, the trial court did not err in nullifying the Third Amendment to the CC&Rs because it was adopted after Miller, as the Calaveras HOA's sole director, impermissibly denied defendants' and the other lot owners' voting rights. However, the court abused its discretion in nullifying the Calaveras HOA's actions and removing Miller from the HOA and ARC. Those orders resulted from the trial court's determination that Miller acted in bad faith and abused his authority. But as we explain below, that determination was based on unsupported factual findings and incorrect legal conclusions. We therefore affirm the court's nullification of the Third Amendment to the CC&Rs, but we reverse and remand for further proceedings consistent with this opinion as to the other forms of corporate relief that Eastside challenges on appeal.

In the general judgment, the trial court ruled in defendants' favor and granted the following relief under their second counterclaim:

"[(2)] a.   [Miller's] actions by and through the [Calaveras] HOA are null and void;

"b.   Assessments paid under protest are to be returned to [defendant] Calaveras;

"c.   The Third Amendment to the CC[&]Rs is null and void;

"d.   [Miller] acted in bad faith and grossly abused []his authority and discretion with respect to the corporation.

"e.   The court finds that it is in the best interest of the corporation that [Miller] be removed as ARC member, and officer, and director of the [Calaveras] HOA pursuant to ORS 65.[32]7, ORS 28.010 and [ORS] 28.050."[14]

To start, we hold that the trial court erred when it relied on ORS 65.327, ORS 28.010, and ORS 28.050, as providing the legal bases to remove Miller from the Calaveras HOA and ARC.

ORS 65.327 permits a court to remove a nonprofit director in a proceeding commenced "by at least 10 percent of the members of any class *entitled to vote* for directors * * *." ORS 65.327(1) (emphasis added). Defendants lacked standing to commence a removal proceeding under ORS 65.327 because, as nondeclarant lot owners, they were not entitled to vote for the Calaveras HOA directors. Indeed, Section 5.2 of the Bylaws expressly give the declarant—here, Eastside— the exclusive authority to appoint the directors of the Calaveras HOA prior to turn over. *See also* ORS 65.311(2) (recognizing that a corporation's bylaws may restrict members' right to elect directors). Additionally, ORS 65.327 does not authorize a court to remove an ARC member because an ARC member is not a nonprofit director.

Moreover, ORS 28.010 and ORS 28.050, which are part of the declaratory judgment statutes, authorize the trial court to "declare rights, status, and other legal relationships" between parties, but neither statute authorizes a trial court to order specific actions.

Therefore, we analyze the trial court's ruling only under ORS 65.281, the sole statutory authority at issue in this litigation that could possibly provide a mechanism for

---

[14] Because Eastside does not assign error to the portion of the judgment ordering that "[a]ssessments paid under protest" be returned to defendant Calaveras, we do not address it here.

Miller's removal and the other forms of granted corporate relief.

ORS 65.281(1)(a)(A) gives a trial court the authority to "[d]etermine the validity and effectiveness of a corporate action or a defective corporate action." When the trial court acts under that subsection, ORS 65.281(1)(b) allows the court to "make any findings or orders and consider any matters the court deems proper under the circumstances."

In accordance with ORS 65.281(1)(b), the trial court issued the following general findings to support its ordered corporate relief in its letter opinion:

> "[Miller] persistently abused his authority and acted in bad faith in the following non-exclusive ways: [Miller] improperly formed the [Calaveras] HOA without notice to the owners nor a vote as required by ORS 94.574; [Miller] then appointed himself as the sole member and director of the [Calaveras] HOA and ARC with voting rights held only by [Miller]; [Miller] has exercised his voting rights in attempts to enrich himself to the detriment of Defendants and owners; [Miller] unilaterally and without notice or a vote amended the CC&Rs for his own benefit; [Miller] refused to grant Defendants' voting rights and has attempted to improperly assess his own attorney fees against Defendants, homeowners, and future homeowners."

Because ORS 65.281 provides for a wide range of permissible acts, we review a trial court's rulings under that statute for abuse of discretion. *State v. Ramoz*, 367 Or 670, 703, 483 P3d 670 (2021) ("We apply an abuse of discretion standard when application of the appropriate legal principles would permit more than one legally correct outcome." (Internal quotation marks omitted.)). A trial court abuses its discretion when it acts outside the wide range of permissible legal outcomes or when its decisions are based on unsupported factual findings or flowed from an incorrect legal premise. *Espinoza v. Evergreen Helicopters, Inc.*, 359 Or 63, 116-117, 376 P3d 960 (2016). We review the trial court's factual findings "for any evidence in the record to support them," *Farnsworth v. Meadowland Ranches, Inc.*, 321 Or App 814, 816, 519 P3d 153 (2022), and any issues of statutory interpretation embedded in those factual findings

for legal error, *S. L. L. v. MacDonald*, 267 Or App 628, 631, 340 P3d 773 (2014).

1. *The trial court did not abuse its discretion when it nullified the Third Amendment to the CC&Rs.*

The trial court did not abuse its discretion in nullifying the Third Amendment to the CC&Rs. That amendment was adopted without the affirmative vote of lot owners representing 75 percent of owned lots, as required under the OPCA and the Governing Documents, after Miller improperly suspended defendants' and the other lot owners' voting rights.

In early 2020, Miller, acting in his position as the Calaveras HOA director, unilaterally adopted the Third Amendment to the CC&Rs. He did so after suspending the voting rights of defendants and the other lot owners. The Third Amendment to the CC&Rs narrows the conditions under which Eastside, as declarant, would relinquish its weighted voting rights within HOA affairs, thereby enabling Eastside to potentially prolong its period of declarant control over the Calaveras HOA to the benefit of Eastside and its member Miller and to the detriment of defendants and the other lot owners.

However, when Miller, as director of the Calaveras HOA, suspended the voting rights, he failed to comply with Section 5.10 of the Bylaws, which require the HOA to provide "notice and a hearing" prior to suspending any lot owners' voting rights for CC&Rs violations. Miller sent a letter to defendants and the other lot owners shortly before the adoption of the Third Amendment to the CC&Rs; the letter simply informed them of the suspension based on the assertion that they were in "default status under the CC&Rs for unauthorized construction and failure to seek and obtain ARC approval of any improvement of [their] lots" without providing any opportunity for a hearing. We reject Eastside's argument that the suspension was proper based on that "default status." Whether or not defendants and the other lot owners were in default, the Bylaws required notice and a hearing prior to voting rights suspension, and defendants and the other lot owners did not receive a hearing.

Turning to the amendment requirements, Section 14.1 of the CC&Rs provides that the CC&Rs may "only be amended by Owners holding at least seventy-five percent (75%) of the votes of the [Calaveras HOA]," where each owner, including the declarant, has one vote per lot owned. *See also* ORS 94.590(1)(a) ("The declaration may be amended only with the approval of owners representing at least 75 percent of the total votes in the planned community or any larger percentage specified in the declaration."). Eastside argues that the Third Amendment to the CC&Rs met the 75 percent approval threshold because, with defendants' and the other lot owners' voting rights suspended at the time that the vote on the amendment took place, Miller's affirmative votes on behalf of Eastside constituted 100 percent of the votes of lot owners who were eligible to vote.

Again, we reject Eastside's argument. Because defendants' and the other lot owners' voting rights were improperly suspended, they were entitled to vote either in favor or against the adoption of the Third Amendment to the CC&Rs. And because they had no opportunity to cast their votes, the Third Amendment to the CC&Rs was not adopted by owners representing at least 75 percent of the lots within the Calaveras planned community whose owners were eligible to vote, as required by both the OPCA and the CC&Rs. Instead, Eastside, who owned just 23 of the 76 lots in the community (approximately 30 percent of the lots), was the only lot owner to assent to the Third Amendment to the CC&Rs by and through its member Miller. Yet Miller, acting as director of the Calaveras HOA, nevertheless formally adopted and recorded the Third Amendment to the CC&Rs. Therefore, the record supports the trial court's findings that Miller, as the Calaveras HOA director, improperly refused to grant defendants' voting rights and unilaterally adopted the Third Amendment to the CC&Rs without holding a proper vote.[15] In turn, we conclude that

---

[15] We note that, although the trial court did not err in finding that Miller, on behalf of the Calaveras HOA, unilaterally adopted the Third Amendment to the CC&Rs without holding a lawful vote, the court erred in finding that Miller adopted the Third Amendment to the CC&Rs "without notice." The letter that informed defendants and the other lot owners of their suspended voting rights

the trial court did not abuse its discretion when it nullified the Third Amendment to the CC&Rs.[16]

> 2. *The trial court abused its discretion when it nullified the Calaveras HOA's actions* and removed Miller from the HOA and the ARC.

We reach a different conclusion on the trial court's nullification of the Calaveras HOA's actions and its removal of Miller from the Calaveras HOA and ARC pursuant to its determination that Miller "acted in bad faith and grossly abused []his authority and discretion with respect to the [HOA]." That is because, contrary to the trial court's determination, Miller did not improperly form the Calaveras HOA. Thus, the trial court's decision to order the nullification of the Calaveras HOA's actions and removal of Miller was based on a bad-faith determination that, in turn, was based on unsupported factual findings and incorrect legal conclusions. We therefore conclude that the court abused its discretion in granting those forms of corporate relief under ORS 65.281 and remand for further proceedings.

The trial court determined that Miller improperly formed the Calaveras HOA because he did not provide notice to lot owners, nor did he hold a vote as required under ORS 94.574. On appeal, Eastside argues that that statute does

---

also expressly states its purpose as providing "notice" of the proposed amendment and includes a copy of the proposed amendment.

[16] It is unclear whether the trial court's finding that Miller "exercised his voting rights in attempts to enrich himself to the detriment of Defendants and owners" refers to Miller's voting as a lot owner to amend the CC&Rs or to Miller's actions as the Calaveras HOA's sole director when he attempted to impose his attorney fees on defendants and the other lot owners. Either way, the finding is supported by the record. We have held that Miller did improperly leverage his voting rights to amend the CC&Rs for his benefit. And, on the issue of attempts to assess attorney fees, the record contains the draft of the Calaveras HOA's 2021 operating budget with a line item for "2020 Legal Expenses" in the amount of $166,844 and an accompanying note stating, "Assessment for ongoing litigation expenses." Miller testified that he, as the only HOA director, was the "sole voter" on adopting that assessment against defendants and the other lot owners. The trial court issued a prohibitory injunction in April 2021 that explicitly characterizes Miller's attempt to assess his litigation fees against defendants and the other lot owners as an "improper encumbrance" and prevents him from doing so "by and through the [HOA]" absent a judgment "specifically allowing such assessment." The record also includes the Calaveras HOA's 2022 budget that, again, only Miller affirmatively voted for as the sole HOA director, and which imposes a $200 per month fee upon lot owners for "legal services."

not apply to the Calaveras planned community.[17] We review the court's decision to apply ORS 94.574 for legal error. *Perma Treat, Inc. v. Toma Investments, LLC*, 344 Or App 725, 742, 582 P3d 194 (2025).

We undertake another *Gaines* analysis to determine whether the trial court correctly interpreted ORS 94.574 as applying to the Calaveras HOA's formation. Here we begin and end with the statute's text. *Gaines*, 346 Or at 164. As relevant here, ORS 94.574(1)(a) states:

> "If the governing documents of a Class I or Class II planned community created before January 1, 2002, that was not created under [the OPCA] do not provide for the formation of a homeowners association, at least 10 percent of the owners in the planned community or any governing entity of the planned community may initiate the formation of an association as provided in this section."[18]

By its plain and unambiguous text, ORS 94.574 applies only to planned communities that were "created before January 1, 2002," that were "not created under [the OPCA]," and whose governing documents "do not provide for the formation of a homeowners association."

The Calaveras planned community is not that type of community. To start, the Calaveras planned community was created in 2015 when Eastside recorded the CC&Rs, which is after, not before, 2002. *See* ORS 94.565(2) (indicating that a planned community "is created by the recording of the declaration"). Next, the Calaveras planned community was created under the OPCA, as evidenced by its CC&Rs, which expressly state that the subdivision is a "Class I planned community as defined in, and is subject to, the Oregon Planned Community Act." Finally, the Calaveras

_____

[17] Defendant Calaveras argues that Eastside's argument against the application of ORS 94.574 is unpreserved. However, Eastside consistently argued throughout this case that it properly formed the Calaveras HOA under ORS 94.625, and we consider that sufficient to preserve its argument that the trial court erred in determining that it improperly formed the HOA under ORS 94.574.

[18] Class I planned communities are those that "contain[] at least 13 lots or in which the declarant has reserved the right to increase the total number of lots beyond 12" and have an estimated annual assessment "exceeding $10,000 for all lots or $100 per lot." ORS 94.550(3). Class II planned communities contain at least five lots and have an estimated annual assessment exceeding $1,000 for all lots. ORS 94.550(4).

planned community's Governing Documents specifically provide for the formation of a homeowners association. Because the Calaveras planned community meets none of the criteria under ORS 94.574, that statute does not apply. Therefore, Miller was not required to adhere to the specific notification and voting requirements contained in that statute, and the trial court erred when it relied on that statute to find that Miller improperly formed the Calaveras HOA.[19]

At the hearing to address Eastside's objections to the proposed form of judgment, the court specifically highlighted the purported improper formation of the Calaveras HOA under ORS 94.574 as a basis for determining that Miller acted in bad faith and nullifying the HOA's actions in totality. When Eastside challenged the court's blanket nullification of the Calaveras HOA's actions, the court referred Eastside to the general findings supporting its bad-faith determination contained in the letter opinion and stated:

> "[Miller] *** acted in bad faith, abused his authority. I listed a number of ways in which that had happened, *including the improper formation of the HOA to begin with.* *** [T]he outcome of that is that *** Miller did not act under

---

[19] Although the ORS 94.574's text and context are unambiguous, we note that ORS 94.574's legislative history supports our interpretation and provides helpful information on that statute's historical significance within the OPCA. *Gaines,* 346 at 172. For nearly two decades following the OPCA's enactment in 1981, the statutory scheme did not apply to a large swath of Oregon's planned communities due to a restrictive statutory definition of "planned community" and a number of exemptions, both of which developers eagerly took advantage of to avoid regulation. Exhibit D, Senate Judiciary Committee, SB 1206, Apr 22, 1999 (submission of Barbara Kanz, CWG); Tape Recording, House Committee on Judiciary, Subcommittee on Civil Law, HB 3912, Apr 25, 2001, Tape 85, Side A (statement of Rich Vial, CWG). In response to concerns that many planned communities were thereby avoiding OPCA regulation—including the statutory requirement to create an HOA—the legislature began incrementally including more of Oregon's planned communities in the OPCA, with significant amendments in 1999 and 2001. Or Laws 1999, ch 677, §§ 1, 3; Or Laws 2001, ch 756, §§ 5, 7.

Importantly, the 2001 amendment, which took effect on January 1, 2002, addressed owners of lots in existing planned communities that, because those communities had been created before the requirement to organize an HOA applied to them, continued to lack HOAs. Specifically, the 2001 amendment added a statutory method for lot owners in those communities to form an HOA and thereby benefit from the OPCA's statutory framework that governs HOA affairs: what has now become ORS 94.574. Or Laws 2001, ch 756, § 3; Exhibit C, House Committee on Judiciary, Subcommittee on Civil Law, HB 3912, May 9, 2001 (submission of Barbara Kanz, CWG); Tape Recording, House Committee on Judiciary, Subcommittee on Civil Law, HB 3912, Apr 25, 2001, Tape 85, Side A (statement of Rich Vial, CWG).

any authority *** because of these abuses and *** that nullified and voided all actions undertaken by the HOA."

(Emphasis added.) That language suggests that the trial court's erroneous legal conclusion that Miller improperly formed the HOA under ORS 94.574 played a major role in its determination that Miller acted in bad faith, as well as its decision to uniformly nullify the Calaveras HOA's actions.[20]

Similarly, in its letter opinion, the trial court explicitly tied its decision to remove Miller from the HOA and ARC to its bad-faith determination, stating, "[Miller] acted in bad faith and grossly abused his authority and discretion with respect to the [Calaveras HOA], and it is in the best interest of the corporation that [Miller] be removed as ARC member, and officer and director of the [Calaveras] HOA."

In sum, the trial court did not abuse its discretion when it nullified the Third Amendment to the CC&Rs. But it did abuse its discretion when it nullified the Calaveras HOA's actions and ordered Miller's removal as the HOA director and ARC member based on its determination that Miller acted in bad faith and abused his authority with respect to the HOA. That is because the trial court's incorrect legal determination that Miller improperly formed the HOA without complying with ORS 94.574 directly influenced that bad-faith determination.[21]

### 3. *Conclusion/Remedy*

We now turn to the question of remedy. As we previously noted, none of the parties asked the trial court for special findings on the complex issues in this case. Thus, what we have reviewed are the trial court's general findings, which the trial court took care to note were "non-exclusive." In light of that reservation and our determination that the trial court did not abuse its discretion in granting some

---

[20] Although not necessary to our resolution of this case, we observe that under ORS 94.625, the general statute governing HOA formation for planned communities, it appears that Miller was required to form the Calaveras HOA on behalf of Eastside, the sole declarant of the Calaveras planned community.

[21] We observe that the trial court's erroneous legal conclusion that defendant Calaveras possesses joint declarant status also appears to have improperly influenced its bad-faith determination. For example, it appears that under ORS 65.311 and the Governing Documents, Miller, acting on behalf of sole declarant Eastside, could properly appoint himself to the HOA and ARC.

of the corporate relief that defendants had requested, it is unclear whether the court would have still ordered the other corporate relief that Eastside challenges on appeal considering the clarification that we have provided in this opinion.

We thus remand to the trial court to reconsider, consistent with our opinion, (1) its determination that Miller, in his capacity as the Calaveras HOA director, acted in bad faith and abused his authority and (2) the corporate relief that it granted pursuant to that determination, including its blanket nullification of the Calaveras HOA's actions, and the removal of Miller as the Calaveras HOA director and ARC member. In assessing the propriety of Miller's removal from the HOA and ARC, the trial court must determine whether such an order is permitted under authority other than ORS 65.327 because, as we have held, that statute does not apply in this case.

We also reverse the supplemental judgment that awarded attorney fees and costs to defendants because that award was based on portions of the general judgment that we reverse. ORS 20.220(3)(a); *Douglas and Minzer*, 334 Or App 341, 349, 556 P3d 1041 (2024) (reversing attorney fees award that related to a judgment that was reversed in part).

General judgment on first counterclaim for declaratory relief reversed and remanded; portions of general judgment on second counterclaim for corporate relief set out in paragraphs (2)(a), (d), and (e) reversed and remanded; otherwise affirmed. Supplemental judgment for attorney fees and costs reversed.